ARGUED AND DETERMINED IN THE

# SUPREME COURT

7  1
77 556

OF THE

# STATE OF WISCONSIN.

———————

MARSHALL, ILSLEY & ELLIS, Appellants,

*vs.*

HENRY WELLS, JOHN BUTTERFIELD, *et al.*, part-
ners under the name and style of THE AMERICAN
EXPRESS COMPANY, Respondents.

APPEAL FROM THE MILWAUKEE CIRCUIT COURT.

As a matter of practice, the party holding the affirmative of the issue has the
right to open and close the argument to the jury ; but a mistake of the judge in
this respect is not a ground of error to reverse the judgment, unless it is mani-
fest that injustice has been done.

The order of argument to the jury is a matter of practice, within the control of
the judge, and this court will not interfere, unless there is a clear abuse of
discretion, to the injury of the party complaining.

As between a bank (consignee) and express carriers of packages, it is compe-
tent, in a suit for the loss of such packages, to prove the habit of delivery
and reception of such packages after the usual banking hours, and in refer-
ence to the arrival of railroad trains at the place of delivery.

The term "banking hours" has reference to the ordinary business of a bank
over its counter, and not to the sending or receiving of packages or messages.

It is competent to banking houses to prescribe certain "banking hours" within
which their peculiar business shall be done. But these hours must be rea-
sonable and adapted to their peculiar business with the public in general.

Vol. VII.                    1

The contract of the common carrier (the Express Company) is, that they will carry the packages or goods entrusted to them, and deliver them to the consignee, at the proper time, and at the proper place, without loss or failure, except by the act of God, or of the public enemy.

The consignor also undertakes that the consignee or some proper person, shall be at the proper place, at the proper time to receive the goods, or in default thereof, upon due notice, the liability of the carrier as such is discharged.

The receiving of packages sent to a bank by express is not a business peculiar to banks, and a tender or delivery thereof, at the counter of the bank is sufficient, though made at 5½ o'clock P. M., and "banking hours" closed at 4 o'clock P. M.

An express company receiving packages at Milwaukee to be delivered to a bank at Madison, is not bound to deliver the same within what are called "banking hours," at the latter place.

An offer by an express company to deliver packages to the State Bank at Madison, (the consignee) at 5½ o'clock P. M. in the month of August, at the counter of the bank to the teller thereof, constitutes a tender, equivalent to a delivery.

It is not a sufficient excuse on the part of the bank (the consignee) for refusing to receive the packages, that they are tendered after "banking hours," and that the vaults are locked and the cashier gone to his residence with the keys.

A delivery by a carrier to the officer or agent of a corporation (consignee) accustomed to receive such consignments from such carrier, is sufficient to discharge the carrier from liability as such.

Where the teller of a bank had been in the habit of receiving packages consigned to the bank from the defendant, an express company, a tender of express packages by the messenger of the company to the teller at the bank, was held sufficient.

After a common carrier has discharged his duty as such, by a proper tender of the goods to the consignee, who refuses to receive them, his possession afterwards is as a mandatary only, and he is only liable for gross negligence.

It is the duty of common (express) carriers to deliver their goods or packages as soon as practicable after arrival at the place of consignment, within the usual hours of transacting general business in such place.

This was an action brought by the plaintiffs, Appellants, against the defendants, Respondents, as common carriers.

The complaint contained four counts; all except the third charging the defendants as common carriers under the name and style of "The American Express Company," with having as such common carriers, received at Milwaukee certain

packages of money or treasure to the amount of $8,000, to be carried and delivered to the State Bank at Madison, within a reasonable time, for reward; but by the carelessness and improper conduct of the defendants, they failed to deliver the said packages, whereby the same became wholly lost to the plaintiffs.

The third count was as follows:

And for a further cause of action against said defendants, the plaintiffs allege that heretofore, to wit: on the 8th day of September, A. D. 1857, at the City of Milwaukee aforesaid, in consideration that the said defendants as such common carriers as aforesaid, then had the care and custody of divers goods, moneys and chattels of the said plaintiffs, to wit: goods, moneys and chattels of the like number, quantity, quality, description and value as those set forth in the first cause of action against said defendants in this complaint contained, they, the said defendants undertook, and then and there faithfully promised the said plaintiffs to take due and proper care thereof, whilst the said defendants so had the care and custody thereof, yet the said defendants not regarding their said promise and undertaking, whilst the said defendants had the care and custody of the said goods, moneys and chattels, took so little and such bad and improper care thereof, that the same afterwards, to wit: on the day and year aforesaid, became and were wholly lost to the plaintiffs.

The defendants answered to the first, second and fourth counts, or causes of action set out in the complaint, admitting the receipt of said packages to be carried from Milwaukee to Madison, and to be delivered to the State Bank, and averring that they did, within a reasonable time, safely carry the said packages to Madison, and did offer to deliver the same to said State Bank which then and there refused to accept and receive the same, &c., &c. That thereupon they took the said packages to their office, in said city of Madison, and locked

them up in their safe, from which they were, during the following night, stolen.

To the third count or cause of action, the defendants answered as follows: That at the time aforesaid "they were common carriers of goods, merchandise and moneys from the City of Milwaukee, in the State of Wisconsin, to the City of Madison, in said State of Wisconsin, and that as such common carriers they received the said goods, chattels and moneys for the purpose of transporting the same from Milwaukee to Madison aforesaid, to be delivered to the State Bank at Madison; and these defendants allege that they did safely carry and convey the same to Madison, and that upon the safe arrival of the same at Madison, they offered to deliver the same at the State Bank in Madison, and the State Bank did then and there refuse to receive and accept the said property and money from the said defendants, and upon the refusal of the said State Bank to receive and accept the same, the said defendants took the said property and money into their custody and control, and caused the said property and money to be put into an iron safe in their office in the City of Madison, and caused the said iron safe to be fastened and secured by locks and bolts, and locked the outside door of their office, and defendants allege that the said money and property was as safely and securely taken care of as they had the means and facility to take care of and secure the same, and defendants allege that while the said money was in said iron safe, and locked as aforesaid, and without any fraud, negligence or carelessness on the part of the said defendants, and unknown to these defendants, their said office at Madison was feloniously entered into in the night time, the said iron safe broken open, and the contents of said safe, including the money of the said plaintiffs, as well as of other individuals, taken therefrom and stolen from these defendants. And these defendants allege that the said money and property of the said plaintiffs was

lost without any fraud, carelessness or negligence on the part of these defendants."

On the trial the plaintiffs called James L. Hill, the teller of the State Bank, and were proceeding to examine him, when the defendants objected on the ground that they had, by their answer, admitted the plaintiffs' cause of action, and had set up matter in avoidance of the plaintiffs' right to recover, and had therefore the affirmative of the issue; and the court sustained the objection, and gave the affirmative of the issue to the defendants; to which the plaintiffs excepted.

The defendants then called as a witness, Frederick Memhardt, who testified that he was the express messenger of the American Express Company, and that his business was delivering packages, goods, &c., brought by express; that last September the express train arrived at Madison between four and five o'clock P. M.; remembered the arrival of a couple of packages addressed to the State Bank, about the 8th day of September last; was the only ones the office had to make delivery. After some objections, the witness further testified : " I took the packages to the Bank a few minutes after five o'clock P. M. This was done as soon as the agent could draw off the packages on my delivery book, and check them. I went to the bank and found the outside door locked. I made a rap on the window, and one of the clerks opened the door. There were some of the clerks in the office. I saw Mr. Hill in the back office; I said, " Mr. Hill, I have got some money for the State Bank." He said, " Fred., you will have to take the money back with you." I had the packages with me at the time, the bag in my hand, and the package in my left hand with my delivery book. I also enter a receipt in the book when I deliver the packages. Mr. Hill said, " Fred., you will have to take the money back to the office, because Mr. Ellis has gone to tea." I had a letter from Marshall & Ilsley; I left that with one of the clerks; I have forgot which young

Marshall et al. vs. American Express Co.

man received the letter; there were two or three of them in the bank. I took back the money and gave it to Mr. Douglas, the agent, who put it back into the safe. I have the book in my hand in which the entry of packages was made. It contains the following entries:

Sept. 8th, 1857.   1 package, $3,042, S. C., (season contract,) State Bank.
                   1 bag,     $4,652 56,              $3 50 State Bank.

That was my usual hour in delivering packages that season. Mr. Hill usually receipted the packages. I don't remember that Mr. Hill ever refused to receive packages before. I delivered all the packages entered in the book which I have." (Witness reads several entries from said book, made between July 17th and September 8th, 1857.) " All these packages were delivered to the Bank and receipted by Mr. Hill. They were delivered at about the same hour as the tender of these packages. There had never been any packages refused before the 8th of September last. Have delivered packages since 8th of September to Mr. Ellis and Mr. Hill, generally to Mr. Hill. After the 8th of September, Mr. Ellis generally came to the express office after the packages that came. I delivered some to the Bank. I offered to deliver one since 8th September; there was only one clerk at the Bank and he told me to take the package back, and I did so. I don't remember delivering many packages after the 8th of September to the Bank. I will look on the book and see." (Looks at his book.) " On the 19th of December I find another package of money, $3,000, receipted by Mr. Hill. It was delivered about half past five, between five and six o'clock. The packages in controversy I took back and put in the safe. The safe was a good large business safe; I don't remember whose make it was. I never saw these packages after I took them to the office. I went to the office next morning a little after five o'clock; the office was locked. The morning express train left about six o'clock A. M. I was accustomed to take the

express matter to the cars. When I reached the office it was locked; I had a key to the office, and I opened it and went in, and opened the window shutters; there were two men sitting on the front door steps; one was named Shipman, from Madison, and the other was from Lone Rock; they were waiting for the agent, Mr. S. saying that he wanted to send off a package. These men went into the office and I went with them. Soon after Mr. Douglas came. I had no key to the safe. Mr. Douglas, the agent, had a key to the safe, and made up the packages. When he came, he put his hand into his pantaloon's pocket and his other pockets for the key to the safe, but could not find it; he then went home again to see if he had not left the key there; he came back and said he could not find the key. It was almost time for the train to leave. Mr. Dyer is the messenger between Madison and Chicago; he carries a safe; it is smaller than the one in the office. Mr. Douglas couldn't open the safe, and he told the messenger he must go without packages. I and the messenger took his safe and went to the depot. The safe in the office was not opened until after I returned from the train. Douglas was at the office then. Mr. Ellis, cashier of the State Bank, was at the express office. I went to breakfast, and then went for the sheriff to come and see what had happened; I told him to bring a set of skeleton keys; he came round but could not open the safe with them; he sent me down for the blacksmith to bring a crowbar; he opened the safe afterwards with the sheriff's keys. The packages had been taken out of the safe. I did not notice the change box on the top of the safe before I went to the cars, but Mr. Douglas showed it to me after I returned and before the safe was opened."

The witness further testified that he had frequently before delivered packages to the State Bank after five o'clock, P. M., and to Mr. Hill, the teller, and that they had never before been refused. The witness was further examined, and cross-

examined at great length, but the foregoing is the substance of his testimony.

The defendants then called as a witness Henry A. Douglas, who testified to the receipt of the packages in question; to the manner of locking them up in the safe, and the circumstances of their loss; from which it appeared that during the night after the arrival of the packages, the keys of the office and safe were stolen; the office and safe opened and the packages stolen therefrom. Much testimony was elicited, in regard to the condition of the office, the character of the safe, and the circumstances of the robbery of the safe, which it is not necessary to give here, as touching the points adjudicated.

The plaintiff called James L. Hill, who testified as follows: "I have been Teller of the State Bank at Madison for the past three years. I recollect the loss of the money spoken of here on the 8th of September. Recollect the night previous of Mr. Memhardt's calling at our office. It was after half past five o'clock in the afternoon by the bank clock; I know by the bank clock; and after the closing up of the business of the day. I mean by closing up the business of the day, counting over the change, looking over the cash account, putting up things and locking the vault. So far as my knowledge is concerned, Memhardt came a few feet into the first room; I was in the back room; I told him if he had anything for us he would have to keep it, the vault being locked and the key gone. I did not hear him speak, I recognized him as the express messenger. He had packages in his hands such as he was in the habit of delivering. He did not inform me that he had any money for the bank. I supposed he had something for us from the fact he was there. I did not hear him speak. Banks at Madison close at four o'clock. J. Alder Ellis is the Cashier of the State Bank and keeps the keys almost invariably. There may have been one or two instances when he has not kept them, but as a general rule I think Mr.

Marshall et al. vs. American Express Co.

Memhardt had been sent to Mr. Ellis with packages. I think I told him Mr Ellis had the keys. He did not inquire where Ellis lived. The vaults of the bank must have been closed about half past five o'clock in the afternoon. If the train arrived at half past four, nearly an hour intervened between the arrival or the packages and the closing of the vaults.— The keys had been out of the bank a short time when Memhardt came. I had frequently receipted money brought by Memhardt. During the months of June, July and August I recollect of Memhardt's delivering packages to the State Bank in the morning after the arrival of the train. I know we have received packages from Memhardt the next morning after the arrival of the packages, but I can't state any particular time from the fact that we are constantly receiving packages. We usually left packages at the Express office for the east the night before the train left."

Other evidence was introduced ; but with what is before stated, and the facts given in the opinion of the court, a further statement is unnecessary.

The main questions of law arise out of the instructions of the court to the jury, which were substantially as follows :

To specific points the judge charged the jury as follows :

1. " That if the defendants sent to the State Bank the packages by their ordinary messenger, known as such to the officers and servants of the bank, in the ordinary course of business between the bank and the defendants, to be delivered to the bank by the messenger, and thereby gave to the bank opportunity to receive them, and the bank refused to receive any express matter from the messenger at that time, that was an offer to deliver for all purposes."

2. " That if it had been the habit of business between the defendants and the State Bank to receive packages of money, received in Madison by the afternoon express from Milwaukee, after banking hours and before the final closing of the

bank building for the day, that custom authorized the defendants to deliver the packages to the bank on the day of the receipt thereof after banking hours and before the bank building had finally closed for the day."

3. " That if upon an offer by the defendants to deliver the packages to the bank, the bank could without serious inconvenience have received and taken care of the packages, a refusal to receive them by the bank was in its own wrong and on its own responsibility, whether such offer was within what are called banking hours or not."

4. " That if on the messenger's appearing in the bank, at about half past five P. M., the teller having reason to anticipate an offer of delivery of express matter to the bank, said ' if the messenger had anything for the bank he would have to take it back and keep it until morning for the reason that the cashier was gone with the keys and the vaults were closed and locked,' I am inclined to think these facts would amount to a tender."

5. " That if they believe that it was the custom of the defendants, on receiving packages in the afternoon to deliver them to the bank after banking hours, and if in accordance with that custom the messenger was sent to the State bank with these packages after banking hours, and the bank refused to receive them, it did so at its peril."

6. " That after an offer by the defendants to deliver and a refusal by the bank to receive, the defendants were in charge of the packages from thenceforth as mandataries only; and responsible for loss by gross negligence only; and that the *onus* of proving such gross negligence lies on the plaintiffs."

7. " That gross negligence was such a want of care as almost evinces a fraud,' and such a degree of negligence as would rather invite depredation upon property than tend to protect it."

To all of which the plaintiffs excepted.

The foregoing points were elaborately explained and illustrated in the general charge to the jury, but the foregoing are the matters to which exceptions were taken, and which are considered in the opinion of the court, the whole charge of the court below being too long for insertion.

*Butler and Buttrick* for the appellants.

1. The court erred in giving the affirmative of the issue to the defendants.

Under the third count of the complaint and the defendants' answer thereto, it was necessary for the plaintiffs, in the first instance, to give evidence of some degree of negligence or carelessness and they were therefore entitled to the affirmative. *Comstock vs. Hadlyme,* 8 Conn. 261. *Brooks vs. Barrett,* 7 Pick., 99.

2. The instructions of the court in relation to the "habit of business" between the defendants and the State Bank, and the "custom" of the defendants in delivering packages to the State Bank after banking hours, are erroneous:

1st. Because the terms, "habit of business" and "custom," are so unqualified and indefinite as to mislead the jury in their determination of what is necessary to constitute such a usage or custom as would affect the liabilities or rights of the parties. Such usage must be so *common* and *general* as to enter into the contract, and become a part of it. *Dawson vs. Kittle,* 4 Hill, 107; *Goodyear vs. Ogden,* 4 Id., 104; *Rushford vs. Hudfield,* 7 East., 224; *Gibson vs. Culver,* 17 Wend., 305; *Crawford vs. Clark,* 15 Ills., 561; *Dixon vs. Dunham,* 14 Id., 324.

2d. Because it is set up in the complaint, and admitted in the answer, that the packages in question were to have been delivered to the *State Bank* in Madison, and that this was the contract between the plaintiffs and the defendants. Such

a contract would require a delivery to the State Bank, in the time and manner established by the general usage and custom of banking; or, in other words, within banking hours, and upon the counter of the bank, while open for business with the public.

Therefore, to instruct the jury that they might find a local and particular custom of the defendants in delivering packages to the bank, after banking hours, for the purpose of affecting the rights of the plaintiffs, is in effect charging the law to be, that a local and particular custom might change and modify an express contract. *Furniss vs. Home*, 8 Wend., 247; Angell on Common Carriers, Sec's. 229 and 230.

3d. It is not sufficient, in order to affect the rights of the plaintiffs, to prove a custom or usage between the defendants and the consignee in this case, without further showing that the consignors, the said plaintiffs, had knowledge of such custom or usage. *Albatross vs. Wayne*, 16 Ohio, 513; *McHenry vs. Rail Road Co.*, 4 Harring, 448; *Gibson vs. Culver*, 17 Wend., 305; *Ostrander vs. Brown*, 15 John., 39; *St. Johns vs. Santvoord*, 25 Wend., 660

3. The instruction of the Court, " That if on the messenger's appearing in the bank at about half-past five P. M., the teller having reason to anticipate an offer of delivery of express matter to the bank, said, ' If the messenger had any thing for the bank he would have to take it back and keep it until morning, for the reason that the cashier had gone with the keys, and the vaults were closed and locked,' I am inclined to think these facts would amount *to a tender*," is erroneous :

1st. Because it assumes the fact that the teller, Hill, *had authority to receive* the packages in question after banking hours, which fact it was material for the jury to find.

2d. Because it assumes the fact that a delivery, " at half past five P. M.," to the teller, after the vaults were closed and

the cashier had gone away with the keys, was according to the established usage and custom between the bank and the Express Company.

3d. Because it is the law, that a bank teller has no authority to transact business of this character in or out of banking hours, for the bank, and no particular custom between the bank and the defendants could affect the plaintiffs without notice. *Mussey vs. Eagle Bank*, 9 Met. 306 ; *Fleckner vs. U. S. Bank*, 8 Wheat., 338 ; *Merchants' Bank vs. The Marine Bank*, 3 Gill., 125 ; *Gloucester Bank vs. Salem Bank*, 17 Mass., 1 ; *Blanchard vs. Isaacs*, 3 Barb. S. C. R., 388 ; *Goodhue vs. Godley et. al.*, 13 Smedes & M., 238 ; *Fortner vs. Parham & Gibson*, 2 Ib., 164 ; *Price vs. Powell.*, 3 Comst., 322 ; *State vs. Commonwealth Bank*, 6 Smedes & M., 218 ; *Manhattan Co. vs. Lydig*, 4 John., 377 ; *Wyman vs. Hallowell*, 14 Mass., 62.

4th. Because a tender of goods to the consignee, by the carrier, must be reasonable in respect to time, place and manner, and this is a *question of fact* for the jury. *Hill vs. Humphreys*, 5 Watts & S., 123.

5th. To bind the consignor, the carrier must at least inform the consignee that he has packages for the consignee from the consignor, or the consignee must have known by some means at the time that the packages were from the consignor, and what they contained. *Packard vs. Getman*, 6 Cow, 757.

4. The instruction of the Court, " That if upon an offer by the defendants to deliver the packages to the bank, the bank could *without serious inconvenience* have received and taken care of the packages, a refusal to receive them by the bank was in its own wrong and on its own responsibility, whether such offer was within what are called banking hours or not," is clearly erroneous, from all the authorities above cited in relation to common carriers.

It is not a question of serious inconvenience, but of obli-

gation or usage and custom, in 'ordinary cases of delivery by common carriers; and in this case it is a question of compliance with an express contract to deliver to the State Bank. It might have been very convenient for the State Bank to have received the packages at the Express office, at any time in the day or the night, but proof of this convenience would hardly be evidence of an offer to deliver to the State Bank; and although it' might have been *convenient* for the bank to have received them, there might notwithstanding have been a reasonable and legal excuse for *refusing* to receive them.

5. The instruction of the Court to the jury, " That after an offer by the defendants to deliver and a refusal by the bank to receive, the defendants were in charge of the packages from thenceforth as mandataries only, and responsible for loss by gross negligence only; that the *onus* of proving such gross negligence lies on the plaintiffs," is erroneous:

1st. Because it assumes that there was an offer by the defendants to deliver at a reasonable and proper time, and a refusal by the bank to receive, without good reason—which facts it was material for the jury to find.

2d. Because the jury might, and probably did, infer from the instruction, that an offer to deliver, whether at a reasonable time and place or not, and a refusal to receive, whether for good cause or not, would reduce the liability of the defendants from that of common carriers to that of mandataries without reward.

3d. Because the defendants, having received the packages as carriers of money and other treasure, and agreed to carry them to the city of Madison, and there to deliver them, for hire, cannot be said, as between themselves and the plaintiffs to have held them as mandataries only.

The capacity in which they hold themselves out to the public, the obligations which the law imposes on them, and their contract with the plaintiffs, alike forbid this. *Ostran-*

*der vs. Brown,* 15 John. 39 ; *Fisk vs. Newton,* 1 Denio, 45 ; *Hill vs. Humphreys,* 5 Watts & S., 123 ; *Merwin vs. Butler,* 17 Conn., 138.

6. The charge of the Court, "That gross negligence was such a want of care as almost evinces a fraud, and such a degree of negligence as would rather invite depredation upon property than tend to protect it," is erroneous :

1st. Because the jury might have well understood that it was necessary to convict the defendants of bad faith, and an intent to injure the plaintiffs, by negligently leaving the packages where they knew they would be stolen.

2d. Because this is not a proper definition of gross negligence. Story on Bailments, §§ 15, 16 ; Angell on Carriers, § 22 ; 1 Smith's Leading Cases, 254 and 255; *Note of Mr. Wallace to Coggs vs. Bernard,* commencing on p. 285 of 1 Smith's Leading Cases ; Am. Ed., 1852 ; *Steamboat New World vs. King,* 16 Howard, 469; *Phila. & Reading R. R. Co. vs. Derby,* 14 How., 468 ; *Nolton vs. Western R. R. Co.,* 15 N. Y. R., 444 ; *Tracy et al. vs. Wood,* 3 Mason, 132 ; *The New Jersey Steam Navigation Co. vs. The Merchant's Bank,* 6 Howard, 344.

*E. G. Ryan and Wm. P. Lynde,* for respondent.

I. The respondent assumed the whole *onus probandi.* Their answer denied no part of the complaint, so as to leave any affirmative averment of the appellants to be established by evidence. The answer confesses and avoids ; sets up new and affirmative matter, upon which alone an issue was made, and the whole burden of proving which lay upon the respondents.

The respondents were therefore entitled to begin and reply 1 Greenleaf's Ev. §§ 74, 75, 76, and note ; 1 Cowen & Hill's notes, 643–648; 1 Phillips' Ev., 483; 3 Chitty's Gen. Pr., 872–876; *Scott vs. Hull,* 8 Conn., 296 ; *Comstock vs. Hadlyme,*

Marshall et al. vs. American Express Co.

8 Conn., 254; *Davis vs. Mason*, 4 Pick., 156; *Brooks vs. Barrett*, 7 Pick., 94; *Lexington Ins. Co. vs. Paver*, 16 Ohio, 330; *Pogue vs. Joyner*, 2 Engl. (Ark.) 462; *Jackson vs. Hesketh*, 3 Eng. Com. L. 456; 5 Rawle, 179; 10 Watts, 337; *Silk vs. Humphrey*, 7 C. & P., 14; *Faith vs. McIntyre*, 7 C. & P., 44; *Aston vs. Perkes*, 9 C. & P., 231; *Steinkeller vs. Newton*, 9 C. & P., 313; *Bingham vs. Stanley*, 9 C. & P., 374; *Smith vs. Martin*, 1 C. & M., 58; *Rowland vs. Barnes*, 1 C. & K., 46; *Birt vs. Leigh*, 1. C. & K., 611.

The exception on this point is, however, immaterial. Permitting the wrong party to open and close is not error within the review of the appellate court. *Scott vs. Hull*, 8 Conn., 296; *Lexington Ins. Co. vs. Paver*, 16 O., 330.

II. The extraordinary liability of common carriers is, of course, not denied. But the power of consignees to continue that extraordinary responsibility, at their pleasure, after a proper tender to deliver, is denied.

The jury in this case, under the instructions of the court below, must be taken to have found a tender of delivery by the common carrier, to the proper person, at the proper place, and at a proper time.

Under the instructions of the court below, the jury must have found either that no custom of closing banks in Madison at 4 o'clock P. M., had been properly proved, or that that custom was controlled by another custom of the banks to receive treasure, forwarded by express, after that hour.

In either case, the tender to deliver has been found good; and that was a question of fact for the jury, fairly submitted to them by the charge.

Having made a proper tender to deliver, the liability of the respondents, as common carriers, ceased. *Smith vs. Nash. & L. R. R.*, 7 Foster, 86; *Garside vs. Trent. & Mer. Nav. Co.*, 4 T. R., 581; *Thomas vs. Boston & P. R. R.*, 10 Met., 472; *Younge vs. Smith*, 3 Dana, 91; *Storr. vs. Crowley*, McClel. &

Y., 128 ; *Norway Plains Co. vs. B. & M. R. R.*, 1 Gray, 263 ; *Gould vs. Chapin*, 10 Barbour, 912 ; *F. & M. Bank vs. Champlain Trans. Co.*, 16 Vermont, 52 ; 18 Vermont, 131 ; *Scott vs. Pettit*, 3 Bos. & Pul., 409 ; *Lewis vs. Western R. R.*, 11 Met., 509 ; Chitty's Com. Carr., 155.

III. The complainant charges the respondents as common carriers only.

If, therefore, the liability of the respondents, as common carriers had ceased, although they might have remained liable as bailees, the appellants could not recover under the present complaint.

IV. The jury found a tender to deliver as testified to by the witnesses, Memhardt and Hill.

It is admitted that upon a tender to deliver and a refusal to receive, the common carrier, although his extraordinary liability as insurer ceases, still owes a duty to the owner in the care of the goods.

But here was not a refusal to receive, properly considered. The request to keep the packages till next morning showed a willingness to receive them, confirmed by all the evidence on the subject.

It was not, then, a case of absolute refusal, but only a refusal to receive *then*, coupled with a request to keep till next day, and an expression of intention to receive then.

If the respondents made a good tender to deliver, it was the duty of the consignee to receive, unless he absolutely refused to receive at all.

And that being the duty of the consignee, the request to keep the package till next day, when it would be received made Memhardt *quoad hoc* the agent of the consignee and not of the carrier.

He took back the packages, not in performance of any duty of the respondents, but at the request and for the convenience of the consignees, who represented the appellants.

V. If, however, any continuing liability rested on the respondents, it was the liability of depositaries only.

And the instruction of the court below, as to the extent of that liability was correct. The respondents were liable for gross negligence only. Story's Bailments, §§ 4, 10, 11, 61, 17 ; Jones on Bailments, 36 et seq.; *Foster vs. Essex Bank,* 17 Mass., 479 ; *Bayon vs. Prevo,* 4 Martin (La.) 64.

The charge of the court below, if it err at all, errs in favor of the appellants. The law was as favorably stated for them, as it could be, and the facts fairly submitted to, and found by the jury.

*By the Court,* SMITH, J. The first error complained of by the appellants is, the direction of the court below in giving the affirmative of the issue to the respondents. It is contended that inasmuch as the ruling gave to the defendants the right to open and close the argument to the jury, they thereby derived and enjoyed an advantage to which they were not by law, and the practice of the court entitled. It is further contended that such error (if error,) is sufficient cause for reversal of the judgment, and that it should be reversed for that cause alone.

It is undoubtedly true that the general practice of the courts of this country, is for the party holding the affirmative of the issue to open and close the argument to the jury ; and so general is it, that the affirmative falls to the plaintiff, that a question of practice seldom arises therefrom. But if we should hold every departure from the strict common law rule in respect to the order of argument to the jury, as a ground of error, and fatal to the judgment, it is feared that appeals and writs of error would be fearfully multiplied.

The strict rule on this subject in our courts is supposed to be, for the plaintiff (or party holding the affirmative of the

issue) to open his cause, stating and maintaining his several points by reference to such evidence as tends to sustain them, together with the points of law and a reference to the authorities; then for the defendant to answer the plaintiff and illustrate and establish his defense, combatting the positions assumed by the plaintiff, and assuming others of his own, and afterwards for the plaintiff simply to reply to what the defendant has said; and in this reply he is confined strictly to the matters urged by the defendant. I have used the terms plaintiff and defendant here for the sake of convenience, but the rule applies equally to whichever party has the affirmative, and *e converso.* But this rule is not always, it indeed often it be observed and enforced. Nothing is more common than for the counsel for the plaintiff to reserve the great portion of his remarks for his closing speech: Or what is also of frequent occurrence, one counsel will open the case for the plaintiff, and another counsel close by an entirely different course of argument. This may be loose, or even bad practice, but it can hardly be assigned for error. Matters of this nature are generally under the control of the judge, and rest mainly in his sound discretion. Sometimes the privilege of the closing argument *may* be of important advantage, and a judge *may* so outrage the well established order of proceedings, as seriously to affect the rights of the parties. In a clear case of such kind, there is no doubt of the power of an appellate court to correct the evil. But such is not this case. It is a matter of some doubt under the pleadings, which party had assumed the burden of establishing an affirmative state of facts. It seems that the counsel and court were in doubt, insomuch, that both positions were respectively assumed in the course of the trial. We cannot say that there was an abuse of discretion in deciding either way in a matter so doubtful and uncertain; and whether the judge erred or not, it was altogether immaterial, and affords no ground

for reversal of the judgment, in view of the state of the case presented by the record.

The other errors complained of, are founded upon the instructions given to the jury on the trial in the court below. Some exceptions were taken to the ruling of the court in regard to the admission of evidence, but as no point is made upon them in the briefs of counsel, and as they were not argued at bar, it is presumed they are not relied upon here. We will therefore proceed to the consideration of the important principles of law involved in the case—principles by no means new ; but to be applied to a somewhat novel state of facts.

Within the last few years, there has grown up in this country a new, extensive and important branch of business, intimately connected with commercial and financial transactions, involving, at the present day, trusts of immense magnitude with corresponding liabilities, risks and responsibilities. This business consists in carrying packages of money, gold and jewels, and the lighter, but more valuable articles of merchandize from place to place, throughout the whole country. The defendants in this case are members of a joint stock company doing the business before mentioned, and known as the American Express Company. Vast amounts in value pass through their hands daily, for the sake of dispatch and safety, regularity in transmission, and punctuality and promptness in delivery. Hence it is important to understand the nature and extent of their duties and liabilities as prescribed by law in every stage of their transactions, from the time of reception to that of delivery of the money or goods committed to their charge.

In this case it is admitted, that the plaintiff on the 8th day of September, 1857, at Milwaukee, delivered to the defendants a package or packages, one or more, containing some $8000, (or nearly that sum) to be carried and delivered to the

"State Bank" in the city of Madison; that the package was received by the defendants in the capacity of common carriers, to be conveyed to the consignee aforesaid for a certain fee or reward. It is also admitted that the packages were not received by the State Bank; but it is contended by the defendants that they did what was in law equivalent to a delivery of the packages, and were hence discharged from their liability as such carriers. On the contrary it is claimed by the plaintiffs, that the packages were never tendered or delivered to the consignee, but were lost while in the custody of the defendants as such carriers, and hence they are responsible for their value.

The facts in the case are by no means complicated, and in the main are undisputed. It appears that the defendants usually carried express matter of this kind in charge of a special agent on the train of passenger cars between Milwaukee and Madison, and that during the months of August and September, the train usually arrived at the latter place between four and five o'clock in the afternoon. The packages were taken to the office of the express company on the arrival of the cars, and were sent from thence, at from five to half past five o'clock P. M. to the State Bank by the messenger usually employed to distribute and deliver express packages, who was told by the teller of the bank, that if he had any matter for the bank he would have to keep it until morning, for the vault was locked up and the cashier had gone with the keys. The packages were taken back by the messenger to the office of the express company, where they were locked up in their safe, and during the night the safe was opened, and the packages with their contents were stolen.

There is some slight discrepancy between the testimony of Hill, the teller of the bank, and Memhardt, the distributing and delivering agent of the Express Company. But these discrepancies are regarded as of little moment, and as in no

degree affecting the principles of law applicable to the case, and by which the rights of the parties involved must be determined.

The questions necessary to be considered, arise out of the instructions of the court below to the jury on the trial of the cause.   These were in the form of specific instructions given at the request of the parties, to which exceptions were taken, and the general charge founded upon the entire case, as disclosed by the evidence.

The bill of exceptions, contains exceptions taken to these specific instructions, which are set out in detail, and also to the general charge set out at length, to which is subjoined the following: "To which said charge and to every part thereof, the plaintiffs by their counsel excepted."

We shall therefore consider these instructions severally, as they become important, and also the general charge, in which the specific points are also noticed, as they are modified, explained and applied to the whole case presented by the evidence.

It is contended by the appellants that the Circuit Judge erred in giving the following instruction to the jury, viz:

"That if it had been the habit of business between the defendants and the State Bank to receive packages of money received in Madison by the afternoon express from Milwaukee, after banking hours, and before the final closing of the bank building for the day, that custom authorized the defendants to deliver the packages to the bank, on the day of the receipt thereof, after banking hours, and before the bank, building had finally closed for the day."

Objections were taken to the expression used by the judge, "habit of business" and "custom," as being so unqualified and indefinite as to mislead the jury in their determination as to what is necessary to constitute such a usage or custom

as would affect the liabilities or rights of the parties. We do not understand the judge as intimating, by the terms so used by him, a custom or usage such as would modify, change, alter or control the common law rule applicable to the relations of the parties, by which the jury would be bound, but as merely directing the minds of the jury to the situation of the parties, their mode of doing business of the kind under consideration, in regard to the particular time and place, respect of which no absolute rule of law obtained.

This was an important feature in the case, and we think the judge was right in the view which he presented for the consideration of the jury. It was not the intention of the judge to instruct the jury in regard to a custom of the bank and others, which was to be adjudged as law, but as to a mode of doing business of the kind, in which the parties had acquiesced, and on which they had a right to depend. It was claimed on the one hand that the defendants were bound by their contract to deliver the packages to the State Bank within "banking hours." There was some slight proof in the case, that what were called " banking hours," were between 9 A. M. and 4 o'clock P. M.—that at the hour of 4 o'clock P. M. the bank ceased to do the ordinary banking business over its counter. But the receiving of letters, messages, dispatches and packages, though pertaining to the usual and necessary business of banking houses, are not of that character. This latter description of business is usually done after its general and promiscuous business with the public at large over its counter, is closed for the day. It was therefore very proper for the parties to prove, and the jury to consider the usual mode of doing the particular business in question, (that of receiving and forwarding packages by express) in reference to the time of the arrival and departure of the trains, with which the parties, consignors, consignees, and carriers in this case are shown to be familiar. Because notes due the bank on a

particular day must be paid before the usual hour of closing the bank on that day, it by no means follows that a mechanic making repairs on its building must quit work at that hour, or that he must present his bill within the prescribed periods. It is difficult to conceive how it is possible to fix the same hour for closing the ordinary banking business of the day, and for the reception and transmission of messages, adjusting of balances, and making remittances, &c., &c. It does not follow that the vaults of the bank are necessarily closed, because the hour for doing business over the counter has transpired. Nor are persons who have a right to transmit messages or packages to the bank, answerable, if they chance to be so closed. Therefore if it had been the habit of the bank to receive packages from the parties, and of the kind in question on the arrival of the train after the hour of 4 o'clock P. M., it was very proper for the jury to consider that fact in reference to the question whether the packages were tendered within a reasonable and proper time. The reception or delivery of packages is not a matter peculiar to the banking business; and the State Bank at Madison had no more right to declare or insist that it would receive no packages after what it pleases to call " banking hours," than has any merchant, warehouseman or wharfinger a right to decline the reception of a valuable package of goods after a certain hour, and in that manner thrust upon the carrier a further continuance of his extraordinary responsibility. It would doubtless be very convenient to consignees, if they were permitted to prescribe rules of delivery, from time to time as their own convenience should suggest. But such is not the law. It is true that it is competent for banking houses, private as well as corporate, to establish rules of business, and to prescribe the times within which its peculiar business with the public shall be done. But this power is not an absolute or arbitrary one. The rules prescribed and the hours of business designated, must be rea-

sonable, and adapted to the exigencies of the particular kind of business, in reference to which they are established, as well for the safety and convenience of the public as for that of the bank. While it is proper and necessary, for the general convenience of all parties, that certain hours shall be named within which the bank will receive deposits, pay bills and drafts, discount notes, &c., &c., it is neither reasonable nor proper, that the same hours shall be designated for the transaction of its other business.

The contract of the defendants with the plaintiffs was, that they would carry the packages in question from Milwaukee to Madison, and deliver them to the consignee (the State Bank) at the proper time, and at the proper place, without loss or failure, except by the act of God or of the public enemy; the plaintiffs at the same time undertaking that the consignee or some proper person on its behalf, should be at the proper place, at the proper time to receive the packages, or in default of which, upon due notice, the liability of the defendants as such carriers should cease.

It is not denied, that a delivery, or tender of the packages at five o'clock P. M., would have been good in case of a merchant, hotel keeper, or grocer, because that is an hour at which all ordinary business men, in Madison, are at their places of business. But it is contended that as the consignee in this case was a banker, the defendants were bound by their contract to make their delivery within the usual banking hours. The receiving of packages sent by express is not a business peculiar to banks; nor is it any part of a banking business, any more than the conduct of correspondence which pertains alike to all kinds of mercantile business. Hence there is nothing in the terms of the contract, expressed or implied, which rendered it obligatory on the defendants to deliver within "banking hours." It was therefore a fit matter of inquiry for the jury, to ascertain by proof what was a proper

Marshall et al. vs. American Express Co.

time, under all the circumstances, to deliver the packages. And we think this matter was properly submitted to the jury. As there was nothing in the contract express or implied, designating the hours within which these packages were to be delivered, it certainly was eminently proper to admit testimony in regard to the habit of business between these parties, carriers, consignors and consignee, as to the time of receiving such packages. The proof shows numerous instances in which the bank had received like packages from the plaintiffs, after four o'clock P. M., without objection or remonstrance from any one, and it would be the height of injustice to allow the consignors and consignees to reap the advantages of a prompt delivery of packages of treasure, on the arrival of the train, and then repudiate such practice when misadventure should suggest.

This is not all. The responsibility of common carriers is an extraordinary one. It is rightfully and wisely so. They are made by the law insurers of the property so committed to their charge, against all loss or damage except such as results from the act of God or the public enemy. I would not lessen it one tittle if I could. The law imposes this extraordinary liability on account of the great trust and confidence necessarily reposed in the carrier, and of his absolute control of the property in transition. But the reason for this rule of law ceases, when the carrier has tendered the property to the consignee, and put it in the power of the latter to take posession of it. And it would be extremely unjust to leave it in the power of the consignee to prolong this extraordinary responsibility upon the carrier so long as his convenience or caprice might suggest. If the carrier delivers or offers to deliver the goods or property at the proper time, at the proper place, and to the proper person, his liability as a common carrier from that moment is at an end, and it is not in the power of the consignee to prolong that liability, however inconvenient it

may be for him to receive the goods. Other duties with corresponding liabilities may be assumed by the carrier, owing to the neglect or refusal of the consignee to receive the consignment, but these are commensurate only with the new trusts devolving upon the new relation, and which are widely different from those of a common carrier. It was therefore proper, inasmuch as the contract did not specifically express the time and hour of delivery, for the jury to find them as matter of fact, considering, not only, the relations of the parties, the time of the arrival of the trains, but also the habit of business between these same several parties. We cannot, therefore, perceive any error in the ruling of the judge in this respect, but on the contrary deem it eminently called for, under the facts and circumstances of the case. To hold that the consignee, could prolong the extraordinary liability of the defendants as common carriers, after the time when they tendered a delivery of the packages, according to their usual course of commerce in that behalf, would be to hold, that because the consignee was a bank, the defendants, as common carriers were bound to know its usual hours for the transaction of general banking business, and contracted to perform their duties as carriers in reference to such hours, notwithstanding any course, or habit of transacting such business which had theretofore obtained between the several parties concerned in this case. And such we understand to be the doctrine, contended for by the counsel for the plaintiffs, viz : that the contract between the plaintiffs and defendants, "would require a delivery to the *State Bank*, in the time and manner established by the general usage and custom of banking, or in other words, within banking hours, and upon the counter of the bank, while open for business with the public."

We have already sufficiently commented upon this point. We will barely repeat, that the delivery of express matter, and the like, that is the transfer and delivery of packages of

Marshall et al. vs. American Express Co.

treasure, the exchange of balances by messengers, the sending off of like packages, and the reception thereof by express upon the railroad trains, can hardly be considered as business which must necessarily be done, "within banking hours, and upon the counter of the bank, while open for business with the public." At all events if it be so, it is not so notorious, so universal, so well, and so long established as to enter into and become a part of the contract in such cases, by implication of law, but should be left to the consideration of the jury under all the circumstances of the particular case, as was done by the court on the trial below.

We have therefore considered the question as to the time of the delivery, or offer to deliver the packages by the defendants, and we are of the opinion that the instructions of the Circuit Judge to the jury on this point, were correct. The delivery of packages of treasure sent by the express company as a common carrier, does not come within that class of general banking business, required by general usage to be done over the counter, within the usual hours of transacting the ordinary business of the bank with the public.

It is also proper to observe, that there is not the slightest proof that this kind of business had been done, or required to be done within any particular hours. On the contrary, the evidence establishes beyond a doubt, that it was the uniform custom of the bank to receive packages of this kind as soon after arrival of the train of cars, as it was convenient to deliver them. Indeed it appears that a part of the message, viz: the letter accompanying the package, was received by the agents, or servants of the bank, on the very occasion when the packages were offered, and that the only reason given for not receiving the packages was, that the cashier was gone, and had with him the keys of the vault which was locked up. Of this latter circumstance we shall speak hereafter.

We have carefully examined the authorities cited by the

appellants to this point, but they do not seem to apply to the state of facts presented by this case.

The next question presented by the case, is: Did the court below properly instruct the jury as to the proper place for the delivery of the packages? and on this point it is understood that all parties are agreed, that the banking house of the consignee was the proper place.

The next question presented for our consideration is, were the instructions of the judge to the jury on the trial below, correct in relation to the person to whom the packages were tendered, or in other words, offered to be delivered.

The portion of the charge of the court below specifically noted in the bill of exceptions, as exceptionable and to which exceptions were taken, is set forth as follows: "That if on the messenger's (of the express company) appearing at the bank at half-past five P. M., the teller having reason to anticipate an offer of delivery of express matter to the bank, said, 'if the messenger had anything for the bank, he would have to take it back and keep it until morning, for the reason that the cashier was gone with the keys, and the vaults were closed and locked,' I am inclined to think these facts would amount to a tender."

This instruction, it is contended by counsel for the plaintiffs, is erroneous for the following reasons:

1. " Because it assumes the fact that the teller, Hill, had authority to receive the packages in question, after banking hours, which fact it was material for the jury to find."

2. "Because it assumes the fact that a delivery "at half-past five P. M.," to the teller, after the vaults were closed, and the cashier had gone away with the keys, was according to the established usage between the bank and the Express Company."

3. " Because it is the law, that a bank teller has no authority to transact business of this character, in or out of banking

hours, for the bank, and no particular custom between the bank and the defendants could affect the plaintiffs without notice."

The first and second objections to this instruction may be considered together, and it is sufficient to remark that the matter of " banking hours" has been sufficiently commented upon. There was no express contract to deliver before 4 P. M., and no custom was proved, on the part of the express company to deliver, or that of the bank to receive before four P. M., and not after. In the absence of such evidence it certainly was not improper to assume half-past five P. M., at that season of the year in Madison, to be a proper time to deliver packages sent by express. And further, that if the delivery, or rather offer of delivery was within proper time, it mattered not to the defendants whether the vaults were locked up or not. The proof shows that the cashier and the keys were not far off, and could have been procured within a very short time. The letter accompanying the packages was actually delivered, and came to the possession of the cashier very soon after the tender of the packages. If the delivery was in time, it was not the duty of the express company to procure the keys and place the treasure in the vaults of the bank. Their duty (as to time) was discharged.

We do not think that the objection to the charge of the judge, that it assumes the authority of Hill, the teller, to receive after half-past five P. M., is well taken. In the general charge, the judge says: " Here the consignee was a corporation, intangible and ideal, which can only operate by its agents, and delivery must be necessarily made to such agents. Delivery to a proper agent of a bank, or other corporation, is the same as delivery to a natural person's hands, where the consignee is a natural person. If the defendants sent their ordinary agent in that behalf to the State Bank to deliver the packages, and he went there with these packages, and there tendered them to

the officer to whom he usually delivered such packages, acording to the usual course of business between the defendants and the bank, that discharges the defendants from their liability as common carriers." Here is no assumption of any fact, but the character and authority of the person to whom the tender of the packages was made, are distinctly left to the jury. In other portions of the general charge these same facts are distinctly left to the jury to find from the evidence submitted.

But the third ground of exception to this portion of the judge's charge, is the most important to be considered, and the one upon which, (the question of time excepted) the plaintiffs seem most confidently to rely. This requires us to determine who was the proper officer or agent of the State Bank to receive the packages in question, and to whom the defendants could at the proper time, tender them in discharge of their liabilities as common carriers.

The bank being a corporation, must act through personal agencies who represent its powers. These agencies are designated and endowed by the proper corporate authority, the evidence of which appears either by the published will of the corporate authority, or by the acts of the agents, ratified and confirmed by such authority. The degree of power lawfully exercised by an agent, is not necessarily measured or limited by the name given to his agency. It depends upon the will of that body, in which the corporate powers are centered, and is a question of fact, and not conclusion of law.

It is contended here by the appellants, that the teller of the State Bank, Hill, had no authority to transact business of this character, either in or out of banking hours, and that no particular custom between the bank and the defendants without notice, could affect the plaintiffs, and to this point several authorities are cited.

In the case of the *Salem Bank vs. Gloucester Bank*, 17

Mass. Rep., 1, a large number of bills, in sheets, of the Glou-
cester Bank had been filled up and signed by the cashier, but
the president of the bank died previous to affixing his signa-
ture.   The sheets were laid away in a desk, on account of the
dampness of the vault.   Some three years after, the desk was
opened by false keys, the sheets stolen, the signature of the
late president forged to the bills, which were put into circula-
tion, and a large amount of them came to the possession of
the Salem Bank in the usual course of business.   The Glou-
cester Bank having refused payment of the bills, the Salem
Bank brought suit to recover the amount.   The plaintiff con-
tended, among other things, that the defendant was liable on
the ground of the carelessness and negligence of their agent,
the cashier, in keeping the bills so signed by him in such
an improper manner and place that they afterwards came
into circulation, and the plaintiffs injured in consequence;
and also that, as the bills got into circulation through the car-
lessness of the officers of the bank, they ought to be consid-
ered the notes of the bank, although the name of the presi-
dent was feloniously put to them by some person into whose
hands they fell.   But it was held that the signature of the
president was essential to the bills, and the consequences of
the negligence and mismanagement of the officers in keeping
the bills in the manner stated were too indirect and remote to
render the corporation liable.

   This case may possibly have some remote bearing upon the
case at bar, but it is not easy to perceive its force.   It decides
that corporations are not answerable for the negligence of
their servants unless acting within the scope of their author-
ity.   This is admitted.   If Hill, the teller of the State Bank,
had no authority to receive the packages, his refusal to receive
them would have no bearing upon the rights of any one.
But that is the very question to be tried.   The contract of the
defendants required them to deliver the packages to the State

Bank, and unless they offered to deliver them to some person (no matter whether an officer of the bank or not) authorized to receive them, if such person was there to be found, they are not discharged of their liability. They did not agree to deliver the packages to the president, the cashier, the teller, or the book keeper of the bank, nor within the vaults of the bank, but to the State Bank, that is, to some natural person authorized to receive them, if such person was present. The question returns, did the State Bank authorize any person to receive these and the like packages of the defendants, and was Hill such person? If Hill was so authorized, the charge of the court below is correct. Whether he was so or not, depended upon the facts and circumstances as they appeared in evidence.

In the case of *Mussey vs. the Eagle Bank,* 9 Met. Rep., 306, the suit was brought by the plaintiff to recover of the defendant the amount of a check for $4,000 drawn by George F. Cook & Co., payable to said Cook & Co. or bearer, on which the following words were written by the defendant's teller: " Good. H. B. Odiorne, Teller.' It appeared that Cook & Co. had no funds in the defendant's hands, payment was refused and the check was protested. It also appeared that Odiorne, the defendant's teller, had been in the habit of certifying that checks drawn on the defendants by Cook & Co. were " good," and that such checks had been received as cash, at different banks, as well as by individuals.

The defendants gave in evidence an article of their by-laws, in which the duties and powers of the teller are explicitly defined, and from which not only no authority was given or could be inferred, to the teller so to certify checks, but limitations and restrictions of his powers and duties are expressed, clearly incompatible with any such authority.

But it was insisted that the continued practice or custom of the teller to certify such checks in the manner indicated, and

in one or more instances with the knowledge of some of the superior officers of the bank, rendered the defendant liable on the ground of usage, although the teller had no express power so to certify.

The court held that the teller had no authority by virtue of the nature of his office or the regulations of the bank, to certify checks in such manner, and that such a custom or usage, if proved, could not avail the plaintiff, as it would be bad in law and could not be upheld; that it would be against public policy, vicious in its tendency, opening up a way for the practice of numerous frauds, and hence could not receive the sanction of the courts.

Such are the grounds on which the court decided the case of Mussey vs. the Eagle Bank; but they do not apply in principle or analogy to the case under consideration. The doctrine of this case is at variance with the usual mode of business transactions in this respect. It stands alone and depends upon the particular facts of that case, and can hardly be considered authority at large, even upon the point decide except as to the particular circumstance of that case, where the powers of the teller were expressly defined and restricted·

The case of *Fleckner vs. the Bank of the United States*, 8 Wheaton, 338, 5 Curtis, 437, decides that the endorsement of a note by the cashier of a bank, to pass the title, is *prima facie* within the scope of his authority, and is valid, especially as in that case, his act was ratified by a vote of the directors. The court says that generally the cashier is the chief executive officer of the bank in its usual daily transactions, and hence it is urged here that it was the duty of the defendants to deliver the packages to the cashier, who alone had authority to receive them. We do not think any such rule can be deduced from the principle of the case just cited. It may be proper to remark that the receiving of the packages of money by express is not peculiar to the banking business; there is

nothing in it which requires the skill, judgment, and discretion of the chief financial officer, but may be entrusted to any one to whose fidelity their safe keeping may be confided.

We may dismiss this point here, so far as the specific instruction to which it relates is concerned, with the remark that the question as to who was the proper person authorized to receive the packages, and whether Hill was such person, were fairly submitted to the jury, upon which the jury have passed; which matter we shall again briefly consider, on review of the ruling of the judge in refusing a new trial.

Another of the specific instructions to which exception was taken is in the following words:

" That if upon an offer by the defendants to deliver the packages to the bank, the bank could, without serious inconvenience, have received and taken care of the packages, a refusal to receive them by the bank was in its own wrong, and on its own responsibility, whether such offer was within what are called 'banking hours' or not."

There can be no substantial objection to this instruction when rightly construed. The contract of the defendants required them to deliver the packages to the State Bank, not to the cashier, president, or other officer thereof, wherever he might be found. The bank, although a corporation, and intangible, yet for the purposes of the contract in this case, had a local habitation, a place where its corporate functions were exercised, and where it might be held responsible for the discharge of its appropriate duties to the public, and to individuals having claims upon it. With reference to such place the parties contracted. The defendants were bound to deliver the packages at that place, viz: the banking house or office used by the corporators, and the bank was expected by the consignors to receive them. There, at that place, on delivery, or what was equivalent to delivery, the liability of the defend-

ants as common carriers ceased. At that place, the bank, if it assumed, or was ready and willing to assume the duties of consignee, was bound to receive the packages. Perhaps the use of the words "without serious inconvenience," by the judge, was unnecessary, as the convenience or inconvenience of the bank might have nothing to do with the duties and obligations of the defendants. If so, the use of the phrase was in favor of the plaintiffs. Most certainly the extraordinary responsibility of the express carriers cannot be prolonged merely to suit the convenience of consignees, whether banks or individuals. We will not undertake to say what might have been the duty of the defendants, in case the banking house of the consignee had been on fire or in possession of a mob. That question does not arise, though even in such case it might be gravely considered whether the carrier, arriving at the place of consignment, and ready to deliver, may be required to continue longer his relations or responsibilities as such on account of the misfortune or calamity of the consignee. This controversy is not between the State Bank and the defendants. The State Bank is not now on trial. The question is, did the defendants fulfill their contract by delivering to the bank, or by doing what was equivalent in the law. They were not bound to furnish a consignee to receive the packages, nor to wait for the plaintiffs to provide one.

We have already said that we do not think the defendants' contract required them to deliver the packages within what are called "banking hours." This term has acquired a meaning among bankers and merchants, but it is by no means uniform. What are banking hours in some places are not in others. In the city of New York, banking hours are understood to be, from 10 o'clock A. M. to 3 o'clock P. M. In the city of Milwaukee, from 9 A. M. till twelve and a half P. M., and from two till four P. M. All we know from the evidence in this case in regard to banking hours in Madison is from

Mr. Hill, who says, "banks at Madison close at 4 o'clock." But however the term may vary as to time, what is understood by "banking hours," in a technical sense is, the particular hours of the day, within which the banks of a city or town transact the usual banking business with the public over the counter, such as discounting bills, receiving deposits, and paying checks, &c. It is reasonable and proper that there should be a uniform hour at which this kind of business should cease, in order to give the officers and agents of the bank an opportunity to write up the books, and adjust its balances for the day. When these banking hours are uniform and reasonable, the law will regard them, in respect to the purposes for which they are established. But these hours only have reference to the intercourse of the bank with the public at large, in relation to the exclusive business of banking. Business quite as important is always transacted after these hours have elapsed. Balances with other banks to be ascertained, cash account brought up, and cash counted; and many other things which will suggest themselves to the banker, which are always done after "banking hours," even the very business of making up and transmitting packages, as well as receiving them; not only because it can be done more conveniently after the businesss with the public is closed, but because until such business is closed much of it could not be done. The convenience or inconvenience of the bank, whether serious or not, had nothing to do with the duties of the defendants as carriers. The particular hours within which the bank usually did its every day business over its counter, with the public, has nothing to do with the duties or liabilities of the defendants. The latter were bound to deliver at the earliest practicable moment.

The next instruction specifically excepted to by the plaintiffs, is set out as follows. " That after an offer by the defendants to deliver and a refusal by the bank to receive, the

defendants were in charge of the packages from thenceforth, as mandataries only, and responsible for gross negligence only, and that the *onus* of proving such gross negligence lies on the plaintiffs."

It is assigned for error upon this point, that the judge assumed that there was, in point of fact, an offer to deliver at a reasonable and proper time, and a refusal by the bank to receive the packages. But it is apparent that this is a mistaken view of this portion of the charge. It followed the general charge, and of course was qualified by the theory of the case presented by such general charge. It was not the duty of the judge, in ruling upon these specific points to review in detail all that he had theretofore given in his instructions to the jury. The judge assumed nothing in this behalf, but left to the jury to find, from the evidence, whether there was an offer by the defendants to deliver, and a refusal by the bank to receive the packages, and if the jury found such to be the facts, he was right in instructing the jury that the defendants afterwards, were in charge of the packages as mandataries only, and were only liable for gross negligence.

It is not our intention to determine here, whether, if the defendants have discharged their duty as common carriers, by an offer to deliver in the manner disclosed by the evidence, any further responsibility whatever remained upon the defendants. We will not here decide whether or not it was competent for Memhardt, the express messenger, after a tender of the packages, and a refusal to receive them by the consignee, to subject the defendants to a different, though less degree of responsibility by assuming for them the character and liability of mandataries, in lieu of those of common carriers. Admitting that the messenger could do so, and thus bind the defendants to a new and different contract of bailment, then the charge of the judge was as favorable to the plaintiffs as the case would warrant. The defendants, after discharging

their duties as carriers, could only be held as mandataries and liable for gross negligence.

It should be recollected that common carriers do not necessarily become warehouse-men on failure of the consignee to receive the goods at the place of consignment. They may contract to do so, but it may well be doubted whether their mere delivering agent may be presumed, from the nature of his duties, to be authorized to assume that character for them. But it is clear that after the offer of delivery at the proper time and place and to the proper person, by the defendants, the obligation of their contract was fulfilled, and the wages of their service in that behalf earned, and that any further service required or performed was outside of their contract, and without reward. Therefore if responsible at all, they were responsible for gross negligence only. We do not see how it was possible for the jury to be misled by any alledged assumption of the judge, even without reference to his general charge. But when the whole charge is considered in this behalf, we think the plaintiffs have no reason to complain.

The next and last point to be considered, (save the exception taken to the order of the judge refusing a new trial) is based upon the charge to the jury in relation to the liability of the defendants, upon the hypothesis that they have made a sufficient offer to deliver the packages, and their messenger had taken them back at the request of the consignee. On this point the judge charged the jury that in such case the defendants were liable for gross negligence only, and that " gross negligence was such a want of care as almost evinces a fraud, and such a degree of negligence as would rather invite depredation upon property than tend to protect it."

We do not think there is occasion for a very critical discussion of the definition of gross negligence given by the judge. He had, in the same sentence, told the jury that ordinary diligence is that which a prudent man would exercise about his

Marshall et al. vs. American Express Co.

own business; that the question of diligence was one for the jury, and depended upon the particular facts in each case; and then used the language, in relation to gross negligence, of which the plaintiffs complain.

The judge rightly remarked that it was difficult to lay down any general rule in regard to degrees of diligence. What would be ordinary diligence in respect to one subject and in some circumstances, would fall short of that degree under other circumstances. And it is believed that the language of the judge in this case, though perhaps rather too strong, is not more liable to exception than that used by Lord Stowell in the case of *Rendsberg*, when endeavoring to elucidate this subject. "If," said he, "I send my servant with money to a banker, and he carries it with proper care, he would not be answerable for the loss if his pocket were picked on the way. But if, instead of carrying with ordinary caution, he should carry it openly in his hand, thereby exposing valuable property, *so as to invite the snatch of any person* he might meet in the crowded population of this town, he would be liable, because he would be guilty of the *neglentia malitiosa* in doing that, from which the law must infer *that he intended the event which has actually taken place.*"    6 Rob. Adm. Rep. 142.

Language similar to this is met with everywhere in the books where gross negligence is treated of. Lord Holt says, that it is a fraud upon the bailer for the bailee to be guilty of gross negligence by which the former suffers loss or injury. On the whole we are unable to say that the judge erred in this instruction, but we are of the opinion that the question of diligence was fairly presented, and that all the facts and circumstances touching that point were fully submitted to the jury.

We have now considered all the points which we deem it necessary particularly to discuss, except the refusal of the

judge to grant a new trial. On examining the motion as set out in the record, it appears to have been based exclusively upon the alleged errors of the judge in the instructions which he gave to the jury, most of which we have already considered, and hence it is only necessary to recapitulate by stating briefly the principles of law which we deem applicable to the case as the same is disclosed by the evidence.

We are of the opinion that the contract required the defendants to deliver the packages in question to the State Bank at the banking house in Madison, as soon as practicable after the arrival of the train; and that they were not confined to what are usually called "banking hours," but could deliver or tender them at any time of the day within the usual business hours of the place, and that if they did offer to deliver the packages to a proper officer or agent of the bank authorized to receive them, their liabilities as common carriers from that time ceased. In this case the delivering agent of the defendants did gain access to the banking office, and to all intents and purposes offer to deliver the packages to Mr. Hill, the teller, at from five to half past five P. M. This we think sufficient as to time. That the usual "banking hours" adopted by the bank for the transaction of business with the public, over its counter, have not, and from the nature of the case cannot have any relation to the transmission or reception of express packages, and hence such banking hours could not have entered into the contemplation of the parties in entering into this contract. It is one among the principle inducements to the employment of express companies for the transmission of these packages, that they shall have a speedy carriage and a prompt delivery.

But in this case it is evident that such hours of the day were not considered by the parties as affecting their contract, from the fact that the train from the east arrived at Madison after four o'clock P. M., and that the parties had uniformly

disregarded those hours, the one party delivering express mat-
ter immediately on the arrival of the train, and the other
receiving it. On this occasion Mr. Hill did not object to
receiving the packages because it was after four o'clock P. M.,
but because Mr. Ellis, the cashier, had gone off with the keys
to the vault which was locked. The letter accompanying the
package was actually received, and it would not have been a
difficult matter to send to the residence of Mr. Ellis and ob-
tain the keys. At all events it was not in the power of the
bank to prolong the extraordinary responsibility of the defend-
ants for such reason, after the packages were tendered at its
counter.

Further, we think Mr. Hill was a proper person to receive
the packages on behalf of the bank. Although the judge
left the question of his authority to the jury to be inferred
from all the circumstances of the case, yet we are of the
opinion that the jury were warranted in inferring such
authority from the character and nature of his office, and the
judge might very properly so have instructed the jury. It
cannot be possible that it is the duty of the agents of the
express company to retain such packages until they can deliver
them to the cashier only; if he is absent, to hunt him up; if
out of town to wait for his return, if the vaults are locked, to
wait until they are opened by the hands of the cashier. The
reception of such packages pertains as much, if not more, to
the appropriate functions of the teller as to those of the cash-
ier. In the case before us, however, there was abundant
evidence, positive and uncontradicted, that Mr. Hill was
directly authorized to receive these packages. He had been
in the habit on all occasions of receiving and receipting for
them, with the full knowledge and assent, of the superior
officers of the bank, at all times on presentation, whether
within or out of banking hours. If he was the person so
authorized by the consignee, it was wholly immaterial whether

the plaintiffs had notice of it or not. It was of no conse-
quence to them who such person was, whether the cashier,
the teller or the porter. And most certainly the defendants
are not to be affected by their want of notice. We do not
wish to be understood as deciding, or intending to intimate,
that it is the duty of the bank to keep its vaults and doors
open, and persons in attendance for the reception of such
packages, after the business of the day is entirely closed.
That question is not before us. In this case the express mes-
senger gained access to the counter of the bank, and a prop-
erly authorized agent was present to receive the packages.

If these views are correct, it follows as a necessary conse-
quence that the defendants' duties as common carriers were
discharged, and their liabilities as such at an end, and what-
ever may have been their character, as bailees afterwards, we
think they were certainly liable for gross negligence only,
and if so,that matter was properly submitted to the jury.

We have been deeply impressed with the importance of
this case, and have given to it all the consideration in our
power and have endeavored to discuss at length, the facts and
principles of law applicable to them, even at the risk of being
tedious. Although the law of bailment in relation to com-
mon carriers is familiar, yet this case has presented some fea-
tures somewhat novel in their character, in the consideration
of which we have been but little aided by authority. We
have however been greatly assisted by the masterly manner
in which it was presented by the respective counsel engaged
and only regret that we have not been able to do justice to
their arguments in the opinion here given.

The judgment of the circuit court must be affirmed with
costs.