## S. S. ALSOP v. THE SOUTHERN EXPRESS COMPANY.

*Penalty—Common Carrier—Express Companies—Statute—*
*Reasonable Regulations—Consignor and Consignee.*

1. Where money was tendered to the agent of an express company at a regular station for shipment at 2 o'clock P. M., and the trains carrying express freight in the direction of the place to which it was to be consigned passed only at 12:55 o'clock each day: *Held*, that a regulation of the company that money would be received for shipment only on the morning before the train on which it was to be transported passed, would not protect the company in an action brought to recover a penalty incurred by violation of the statute (*The Code*, §1964) requiring all transportation companies to receive goods of the kind and nature usually transported by them whenever tendered.

2. The words "under existing laws," in the subsequent clause of the statute referred to, qualify the word "forward," and are used in reference to the rules governing the legal relations of consignor, consignee and the connecting lines.

3. The words "whenever tendered" can only be qualified by supplying the ellipsis, "within the usual hours adopted by the public for the transaction of such business at the place where the tender is made."

4. Where the company relies upon the defence that the tender was not made during business hours, it is within the exclusive province of the jury, looking to the customs of business men at the place of tender, to determine whether it was made within such hours.

5. Railroad companies are compellable by law to admit the agents of express companies, with their safes, on their trains.

6. Express companies are required to deliver money or goods transported by them as soon as practicable after they reach their destination, within business hours, at the residence or place of business of the consignee, or such other place as he may designate within reasonable distance of the station where they are received.

7. If no statute had been passed, the Courts could not, considering the difference in the relation of carriers and their customers two hundred years ago and a consignor and express company of the pres-

ent day, hold that a regulation requiring one who comes to a station to ship money by invitation should be subjected to the risk of guarding his money during the night, was reasonable, when the responsibility of the company, as consignee. renders it essential to make preparations for the safety of money and valuable packages received and held as consignees, with the liability of carriers.

CIVIL ACTION, brought in the Court of a Justice of the Peace to recover a penalty of fifty dollars, under the provision of section 1964 of *The Code,* and heard, on appeal, by the Superior Court of HALIFAX County, before *MacRae, J.,* on the following case agreed :

1. The defendant is a common carrier and transportation company, duly chartered and doing business in the State of North Carolina

2. That, on the 9th day of January, 1889, the plaintiff tendered to the defendant's agent at Halifax (a regular station on the Wilmington and Weldon Railroad Company's line, from which the defendant company shipped freight by express), whose duty it was to receive freight and money at said station for shipment, the sum of $70, in money, for shipment by said company to Battleboro. a station at which there was an express office and agent, and the agent declined to receive the same on said day.

3. The defendant company, by virtue of their charter, were regular carriers, engaged in the transportation of money and other articles by express.

4. That when said money was tendered, for shipment, to the defendant's agent, he informed the plaintiff that he could not receive it for shipment on that day; that an order had been issued a few days previous from the superintendent of the company, directing the agents not to receive money for shipment by express unless the same was tendered prior to the arrival and departure of the train going in the direction

of the point of destination on which the company shipped such articles.

5. That the said money was tendered to the agent for shipment after the departure of the train for Battleboro, and that the agent informed the plaintiff that he would receive said money on the following morning and transport it to its destination.

6. That there was only one train passing Halifax, going towards Battleboro, during the day of tender, on and by which the defendant transported express.

7. That said money was received for shipment two days thereafter, and shipped by defendant to its destination.

8. That the notice to the agents of the company not to receive shipments of money unless tendered prior to the departure of the train, was sent out in the form of a circular letter to the agents, and that the public had not been notified of such notice, nor did the plaintiff know of such regulation until so informed by the agent.

9. That the train for Battleboro left Halifax at 12:55 P. M., and said money was tendered at 2 P. M. on said 9th day of January.

On the foregoing facts agreed, it was considered by the Court that the defendant is a transportation company within the meaning of section 1964 of *The Code,* and that money was an article of the nature and kind received by such company for transportation.

It was further considered that said company might receive money for the transportation under reasonable regulations as to the time during the day when it would receive the same, and that it was reasonable to require that money tendered for transportation to said company should be tendered before the arrival and departure of the train on which the same was to be transported.

Judgment against the plaintiff, from which he appealed.

*Mr. R. O. Burton,* for the plaintiff.
*Mr. W. H. Day,* for the defendant.

AVERY, J.—after stating the facts: This controversy depends upon the construction given to section 1964 of *The Code,* which is as follows: "Agents or other officers of railroads and *other transportation c mpanies,* who-e duties it is to receive freights, shall receive all articles of the nature and kind received by such company for transportation, *whenever tendered at a regular depot,* station, wharf or boat-landing, and shall forward the same by the route selected by the person, *tendering the freight under existing laws,* and the transportation company represented by any person refusing to receive such freight, shall be liable to a penalty of $50, and each article refused shall constitute a separate offence."

The plaintiff tendered to the defendant's agent at Halifax (a regular station on the Wilmington and Weldon Railroad line, from which the defendant company shipped freight and money) $70 in money for shipment to Battleboro, another station on said line of railway, at which the defendant company had an office and an agent, and the agent refused to receive it, because the company had ordered its agents not to receive money except on the same day prior to the arrival and departure of trains going in the direction of the point to which the shipment was destined. The tender was made at 2 o'clock P. M., and a train carrying express freight had passed at 12:55 P. M. on the same day. According to the schedule, the next train, by which the defendant shipped money and freight, would pass on the next day at 12:55 P. M.

If the parties had not so agreed, the law would have determined, that money was an article of the nature and

kind usually received by express companies for transportation, and, moreover, that it was the peculiar business of corporations of this character to carry money and small but valuable packages. *Southern Express Co.* v. *Railroad,* 5 Myers' Fed. Dec., § 1511. While express companies, as declared by Justice MILLER (*Southern Express Co.* v. *Railway Co.*), do not carry bulky freight, it is not the business of railway companies to carry money, and the latter cannot be held liable for its loss, while being transported in the trunk of a passenger, beyond the amount which a prudent man would deem proper and necessary for travelling expenses. *Jordan* v. *Fall River Railroad Co.,* 5 Cush., 69. So it is peculiarly the business of express companies to carry and collect money along the lines of our railways

The meaning of the portion of section 1964 of *The Code,* that is material to the settlement of this controversy, could not be plainer; if by dispensing with verbiage that is unnecessary, because applicable to other corporations, it should be summarized thus: "Agents or officers of express companies shall receive money, *whenever tendered* for shipment at a regular station, where such companies have agents and are accustomed to receive goods for transportation." If we adopt this fair and reasonable interpretation of the language of the law, it would only remain for the Court to decide whether the regulation with regard to the hours of business is reasonable, and one that would be sustained as within the purview of the powers of the company.

When we had banks issuing bills under charters granted by the State, they were required to redeem their bills when tendered with gold or silver coin, but the Courts construed the requirement to mean when offered for redemption within such business hours as the banks had a right to prescribe. But it. has been held that these hours must be reasonable and adapted to the peculiar nature of the business that the corporation is transacting with the public in gen-

eral.  In *Marshall* v. *Express Co.*, 7 Wis., 1, the Court held,
that though a bank might prescribe hours of business from
9 o'clock A. M. to 4 o'clock P. M., yet they could not compel
an express company to conform strictly to such hours in the
delivery of money. and that a tender to the bank, of money
packages, at 5 o'clock P. M., would be good, if the jury found
that a reasonable hour for making it.   In the same case, the
Court says further: '' It was, therefore, very proper for par-
ties to prove, and the *jury to consider*, the usual mode of
doing the particular business in question (that of receiving
and forwarding packages by express) in reference to the time
of the arrival and departure of trains, with which the con-
signor, consignee and carrier in this case are shown to be
familiar.   Because notes due the bank on a particular day,
must be paid before the usual hour of closing the bank on
that day, it by no means follows that a mechanic, making
repairs on its building, must quit work at that time, or that
he must present his bill within the prescribed period.''
While granting the power of the banks to make reasonable
regulations, generally, they could say further, " The rules
prescribed and the hours of business designated must be
reasonable and adapted to the exigencies of the particular
business in reference to which they are established."   Such
was the view of the common law, presented with irresisti-
ble force and great clearness by the learned Judge who
delivered this opinion, now cited as a leading case, upon the
right to establish hours of business, and upon the question,
whether, when prescribed, the law will enforce conformity
to them, as reasonable, on the part of other persons and cor-
porations dealing with the framers of such regulations.

   It will be noted that the Court there held that a tender
at a reasonable hour, and a refusal to receive by the bank,
relieved an express company of the responsibility of
insurers, and changed their relation to the bank to that of
a mere mandatory, liable for gross negligence only, though

the teller of the bank to whom the money was offered, declared that his bank had a regulation as to hours, and refused to receive it because of such rule, and because the cashier was absent and had the key to the safe. But in the face of a statute requiring them to receive money " whenever tendered," the defendant company's agent should not be allowed to meet the plaintiff, who comes to deal with him by invitation, and decline to receive his money for shipment, because of a regulation of his company, declared reasonable " under existing law." Such a rule would enable a defendant company, by late receipts and speedy delivery, to rid itself of the responsibility and reap the rewards of its work with the minimum of risk at both ends of the line.

It is clearly a question for the jury, under the instructions of the Court, in cases like this at bar, as it was in that, to determine, whether looking to the custom of business men generally, at the particular place (here, Halifax) as to hours of repose and times of taking meals, the tender, (at 2 o'clock P. M.) was made at a reasonable hour. The most liberal construction would not allow the Courts to limit the operation of the words " whenever tendered " by supplying any other ellipses after them than " within the usual hours adopted by the public for the transaction of such business, at the place where the tender is made." This rule avoids the inconvenience of offers of goods at midnight or at mealtime, while it steers clear of the other extreme of neutralizing the force of the whole enactment, by holding that the words "under existing laws," in the next clause of the section, limits the time of tender as well as of forwarding, and that the old common law, governing the receipt of goods by boats and wagons, still exists and is applicable to-day to these gigantic corporations.

The study of the several statutes relating to the receipt and shipment of goods by corporations, will shed further light upon the legislative intent in enacting section 1964 of

*The Code.* By the Act of 1871–'72, ch. 138, § 35 (*The Code,* § 1963) it was prescribed that railroad companies should furnish sufficient accommodations for such freights and passengers as should, "within a reasonable time previous thereto, be offered for transportation," and should be liable in damages to the party aggrieved for neglect or refusal to provide such means of transportation. Subsequently, the Legislature seems to have realized that the requirement to furnish accommodations within a reasonable time was but a reaffirmance of the common law (leaving the Courts to say what time was reasonable), and, therefore, passed the Act of 1874–'75 (*The Code,* § 1766) fixing the limit of delay in shipment at five days after delivery by the consignor. This law was pronounced constitutional in *Branch* v *Railroad Co.,* 77 N. C., 347, and railroad companies were held liable for the penalty for delay in shipping freight, as prescribed in that section. Then it was (when the opinion was rendered in *Branch* v. *Railroad Co.,* in the year 1877) that the discussion arose as to the right of a consignor to compel a railway corporation to receive freight when offered for shipment, and store it in its warehouse till cars could be procured to transport it.

The Act of 1879 (*The Code,* § 1964) was passed to meet the suggestion that the ancient principal, laid down as applicable to the cumbrous old conveyances two hundred years ago, still survived and conferred on the railroad companies the power to compel the shipper to camp with his wagon at the station, and guard his goods till the last hour of time fixed by law, and receive them only when the train was on the eve of departure. But the statute was so drawn as to include not only railroad companies and steamboat lines under the general description, but also "other transportation companies, whose duty it is to receive freight," and to require them to receive "all articles of the nature and kind received by such company for transportation,

whenever tendered," thus plainly indicating a purpose to include express companies, because they claimed the exclusive right to transport money and goods of certain kinds

The manifest intent of the Legislature was to force all corporations, coming under the description in the statute, to take goods, when offered for shipment at a regular station, with the full measure of liability growing out of its custody, even if they should not be shipped till near the expiration of the five days, and then *forward* them *under existin g laws*, fixing the legal relations of consignor and consignee, and the duties and liability of the carrier company and its connecting lines. Evidently the evil intended to be remedied was the refusal to take goods or money immediately, when offered for shipment to an agent of one of these companies, and the history of the legislation in aid of shippers but adds emphasis to the unmistakable expression of this purpose.

But the interpretation contended for, that the words " under existing laws " should be construed as qualifying the words " whenever tendered," instead of the word " forward " only, would lead—if the common law is correctly interpreted by defendant's counsel in connection with the statute—to the strange conclusion that the obligation of an express company to receive money tendered for shipment remains now just what it was before the act of 1879, and the company can, under regulations declared reasonable by the Courts, still fix the hour of receipt, just as it was before, and thus render nugatory by their rules the provision of the law imposing a penalty. Railway companies are inseparably connected with other transportation companies in the act, and, therefore, it is just as competent for the Courts to declare a regulation that compels a consignor to hold his cotton in his wagon for four days, awaiting the arrival of freight cars, to be reasonable and lawful, as one that forces a person to retain and guard his money till before the departure of a

train on the next day.  If it is unlawful to force one of these corporations to place in its office or warehouse goods of the nature that it is accustomed to carry, in violation of its regulations, because of the liability incident to its receipt, the rule must apply equally to all others comprehended under the description contained in the section, and clothe all with the power to repeal or modify the law by such reasonable rules as would prove sufficient to obviate the penalty.

But it is further contended that, if the companies comprehended under the section in question do not formulate any rules to govern their agents in the receipt of freight, the principles of the common law would apply to them. And thus, under this view, the same satisfactory result would be reached by the defendant, if it be held that the law of to-day, applicable to this new species of transportation agency, which permeates the world with its officers and agents, everywhere delivering money, jewels and other valuable goods, is the same, that governed the receipt of packages by a carrying cart in the time of Bracton, or the tender of goods to a vessel sailing from Liverpool two hundred years ago.

If, for the sake of argument, it be admitted that the General Assembly meant to inaugurate no change, but simply to publish the vain and empty declaration that transportation companies would hereafter, just as heretofore, receive freight under "existing laws," and, consequently, under any regulation made by the companies and adjudged reasonable by the Courts, would it follow, that the Courts would declare the rule under which a wagoner engaged in carrying goods could compel his customer to wait till the horses should be hitched, reasonable and applicable to express companies?  The result of giving the sanction of the Court to such a rule, would be that these companies could induce an individual, by inviting his patronage, to come to one of their regular stations to entrust his money to

their care, and then compel him to stand guard over his treasure a whole night in order to protect the company from a risk that it can better afford to incur than the customer. But in order to a proper discussion of this view of the subject, it is necessary to understand that the nature, powers and liabilities of express companies have been defined by the Courts.

An express company is a species of common carrier to which have been accorded privileges, and which, from the nature of its business, incurs great responsibility. These companies originated in the necessity, when the growing commerce of the world began to be conducted through the agency of railroads and steamboats, for securing the safe carriage and speedy delivery of small but valuable packages of goods and money. *Witbeck* v. *Holland,* 45 N. Y., 13, Am. & En. Cyclopædia of Law, 781–784 ; 5 Myers' Fed. Dec. Carriers, sec. 1511. They are essentially different from railway companies, not only in the fact that the latter carry more bulky freight, but they collect money and do other things, that would be held *ultra vires* if attempted by a railroad company. 5 Myers' Fed. Dec. Carriers, 1509. It has been held that a railroad company could not refuse to carry for an express company, according to the peculiar methods of their business, and would be compelled by the Courts to admit the messengers of all these companies to its cars with its safes on equal terms, and without inspection of their safes. 5 Myers' Fed. D. c. Carriers, § 1508 ; *ibid*, § 1519. If a railroad company engage in these branches of the express business, authorized by their charters, they must not deny to express companies equal privileges with themselves as to that business. 5 Myers' Fed. Dec. Carriers, § 1508 ; *ibid.,* §§ 1515 to 1521 ; *Gomblos* v. *Philadelphia, &c.,* 9 Phil., 411 ; *Texas Ex. Co.* v. *Texas,* 6 Fed. R., 426 ; *Messenger* v. *R. R. Co.,* 18 Am. R., 754 ; *Express Co's* v. *R. R. Co's,* 3 Am. & En. R. Cases, 591.

Apart from the construction of our statute, it is the duty of the express companies to receive all goods offered for transportation, upon the payment or tender of their charges, but prepayment will be considered waived if not demanded. *N. J. Steam N. Co.* v. *Bank*, 6 Howard, 344. They are required, too, to have adequate facilities within a reasonable time, and cannot be exonerated for delay on account of increased expense, though not foreseen and not entirely unreasonable. *Condiet* v. *R. R. Co*, 54 N. Y., 500. An express company could, in the absence of a statutory requirement, refuse goods on account of an unusual rush of business, especially when the goods offered for transportation are of a perishable nature. Hare on Contracts, 155. But these are the rules without reference to any such enactment as that before us for construction.

When goods are received by an express company without any special or valid contract limiting its liability, it insures the safe and speedy personal delivery of the articles received at the place of destination, if on its route, or, if not, then at the end of its route. *Witbreck* v. *Holland*, 45 N. Y., 13; Bishop on Con, §§ 432, 591, 596. Even if the goods are placed in a warehouse, if not shipped immediately the liability as insurers begins on the receipt for them. 7 Am. & En. Cy. of Law, 546, 558. A high degree of care is required of an express company in the delivery of goods. They must deliver them as soon as practicable after they reach their destination, within business hours, to the consignee at his residence or place of business, unless he authorize or direct delivery to be made at some other place within reasonable distance of the station. *Marshall* v. *Am. Ex. Co., supra ; Witbreck* v. *Holland*, 45 N. Y., 13. After the consignee receives notice from the company of the arrival of his goods, he is not bound to call at the office for them, but need only notify the company of his residence, place of business, or where he

may be found, and the liability of the company as insurers remains till delivery, or tender of the goods, at the place designated, within business hours, and failure by consignee to receive or pay charges. *Witbreck* v. *Holland*, Pr. (N. Y.), 273; Am. & En. Cy. of Law, pp. 567 to 570. If in the interim between its arrival at its destination and the delivery, as the law requires, a package of money should be stolen from the agent, the company would be liable to the consignee. Supposing that a friend had sent by express one thousand dollars from Battleboro to the plaintiff Alsop at Halifax, and the latter lived several miles out of the town, we can readily see that it might require more than twenty-four hours for the company to rid itself of liability as a common carrier, and meanwhile it would be strangely negligent if it failed to provide a safe for the security of valuable property and money received for its customer and held as an insurer.

With this review of the relation that the defendant sustains to the public, under other circumstances necessitating the provision at all offices where money is received of the means to make it safe and secure from thieves till delivery, it is submitted, that if the Court is to determine (leaving the statute out of view) whether a citizen, who comes from the country unprepared to protect his property, shall be required, rather than a company provided with safes, servants and secure rooms, to incur the risk of the custody of a sum of money, it should be guided by reason and look to the situation of the parties and the preparation that the law intends shall have been made by each or either for assuming the responsibility. Experience has shown that the principles of the common law are pliable, and a few fundamental rules have been expanded so as to furnish the basis of important branches of the law governing us at this day. This is notably true as to corporations. But while the ancient landmarks of the law are worthy of veneration, and should be examined with conservative care in determining how they

meet the exigencies of a progressive age, we should not be so subservient to precedent as to blindly follow it when no longer sustained by reason.   It strains the faith of the young student when he attempts to follow Lord Coke in his discoveries of all the hidden diversities in the text of Lord Lyttleton, and when we profess to find, in the mouldy blackletter volumes of past centuries, a principle that, with prophetic ken, was formulated to meet and solve a problem arising out of the adjustment of the relations between the people and one of the greatest and most useful corporations in the world, we must, if we would avoid shocking the common sense of mankind, find a rule founded on reason.   The fact that a captain and crew of a vessel, according to the English authorities, had the right, in the thirteenth year of William III, to refuse to receive freight offered for shipment till the vessel was ready to sail, furnishes no analogy that can be safely applied to govern the relations of the plaintiff and defendant.   The case of *Lane* v. *Cotton*, 1 Lord Raymond, heard at Easter Term, 13 William III, decided this principle, and is the only authority cited in Story on Bailments, § 508, to sustain the rule announced by the author.

It may have been just at that remote period to require the shipper, who had protected his goods on the way to the point of delivery, to continue his oversight over them rather than force a driver, whose attention was required to be devoted to the preparation for his journey, or the master of a vessel, who, with his crew, was engaged in repairing and inspecting it and laying in supplies for a voyage, to take them prematurely, for that would have made it requisite for them to prepare a place for storage, which they need not otherwise provide.   But an express company, as we have seen, incurs, from its nature, such liabilities as to require a place of storage at every station, so guarded as to insure the safety of property consigned to its care, and it is

not unreasonable to require the same care of money ten-
dered for shipment during business hours.    *Cessante ratione,
cessat et ipsa lex.*

If, therefore, the statute were not written in plain terms,
and if the history of legislation on this and kindred sub-
jects did not indicate that the manifest meaning of the lan-
guage was what the Legislature intended to express, still we
ought to bring this question to the touchstone of reason,
based upon a broad view of the condition of the parties
interested, and decide it as an original one—of the first
impression—between a new and important public agency
and a citizen, just as the English Judges considered the
question involved in *Mars* v. *Slue* (cited in *Lane* v. *Cotton,
supra*), and bearing in mind that it is more just to impose
a risk upon a body politic abundantly prepared to incur
it, than upon an individual who has placed his goods
in peril on the invitation of the corporation.

It is admitted that railroad companies have the power
to provide different cars for excursionists, who purchase
tickets at reduced rates, from those occupied by passengers
paying more per mile, and, also, that they have the right to
assign a separate car for colored people, as decided by this
Court; but should our Legislature pass a law prohibiting,
in plain terms, such discrimination, the Courts would be
compelled to enforce the law, if not pronounced unconsti-
tutional.    Such a law could not be ignored utterly in a dis-
cussion of these subjects after its passage.

It seems safe, therefore, to conclude that:

1. The first clause of section 1964 is in itself a full and
complete expression of the Legislative intent that goods
shall be received *whenever tendered,* and that the language
cannot, by any accepted rule of interpretation, be limited
further than to require that the tender shall be made during
hours that cannot be reasonably claimed, according to the

usages of business men at the place of tender, for repose or for taking meals.

2. The words *"under existing* laws" can be construed to qualify the word "forward," and to mean that, at least when the law is applied to railroad companies, the goods shall be shipped within five running days from delivery (as required by *The Code,* § 1966), and subject to the law fixing the relations of consignor and consignee, the carrier and its connecting lines, while the construction contended for would give the statute no effect, but leave the law as it was before its passage.

3. If no statute had been passed, the Courts could not, when the relations of plaintiff and defendant were so widely different from those existing between the carrier of the last century and his customer, have declared that an express company could not be compelled to receive goods till the hour of shipment, in conformity to the ancient rule, or that the transportation company could arbitrarily determine, by regulations prescribed for the government of its agents, exactly how it would, *ex gratia,* or with a view entirely to its own convenience, allow a departure from the old rule by giving further time.

There is error, as the defendant did not rely affirmatively on the defence, or insist on a finding that the tender was made at a time other than in *business hours.* The judgment on the facts found must be for the plaintiff.

Error.

CLARK, J., (concurring): At common law common carriers were under no compulsion to receive goods or freight till ready to ship the same. *Lane* v. *Cotton,* 1 Ld., Ray, 652. Nor, after acceptance of the goods for shipment, were they liable for delays if the goods were shipped within a reasonable time, and what was "a reasonable time" depended upon the facts and circumstances surrounding each particular

case. These regulations sprang out of the former condition of things when the modes of transportation were of a more primitive order. The law-making power in this State has modified the common law rule in both particulars.

In 1874–'75 the Legislature enacted the statute, which is now section 1967 of *The Code*, making a delay of more than five days in shipping goods after accepting them *per se* unreasonable delay, and affixing a penalty of $25 for each day's delay beyond that limit. This act has been held constitutional, and has found judicial construction in several cases with which the profession is familiar. *Branch* v. *Railroad*, 77 N. C., 347; *Keeter* v. *Railroad*, 86 N. C., 346; *Branch & Pope* v. *Railroad*, 88 N. C., 570.

It still remained in the power of common carriers to nullify the Act of 1874–'75, by exercising their common law right of not receiving goods till their own convenience should be suited or they should be in readiness to ship. For this reason, doubtless, the Legislature passed the Act of 1879 (now *The Code*, § 1964), which provides that " railroads and other transportation companies, whose duties it is to receive freights, shall receive all articles of the nature and kind received by such company for transportation " *whenever tendered* at a regular station," &c.

The words " whenever tendered," upon a reasonable construction, signify " whenever tendered" in the ordinary business hours of such companies at the place of tender. If the object had been to prescribe merely the place where the tender should be made, the statute would have naturally read " *if* tendered at a regular station," &c. " *Whenever* tendered " has, clearly, reference to the time of tender and to the common law rule which gave the carrier the right to defer accepting goods till ready to ship. The regulation adopted by the defendant company, that it will only receive packages each day just before the departure of

the train going in the direction of the desired shipment, is in direct conflict with the statute. To give it validity would enable transportation companies, by regulations adopted in their own interest and for their own convenience, to repeal an act of the Legislature passed in the interest of and for the convenience of the public. An analagous case is the decision in *Branch & Pope* v. *Railroad,* 88—573, which held to be invalid a regulation " Goods to be shipped at the convenience of the company," which had been inserted by the defendant in its bills of lading, in hope of avoiding the penalties of section 1967.

It is our duty to give the statute such construction as will effectuate the legislative will. Should its execution, according to a fair and legitimate construction, impose any hardship upon transportation companies, the remedy is to be sought in a modification of the act by the Legislature, and not in its virtual repeal by judicial construction.

Error.

MERRIMON, C. J., (dissenting): I do not concur in the opinion of the Court, and will state some of the grounds of my dissent.

The defendant is a common carrier of numerous kinds and classes of freights, including gold and silver, coined and uncoined, treasury notes, bank notes, public and private securities, gems, jewelry and the like. It is not, however, such carrier of all kinds and classes of freights; it carries mainly such as require to be transported quickly, and, generally, such as are not very ponderous.

A leading and distinctive feature of its purpose is to transport and deliver such freights as it carries certainly, promptly and expeditiously. It is not a warehouseman or despository of freights of any kind; it simply and only receives the same for such transportation, and it holds, or should hold them, for that purpose as short a time as practicable in the

orderly course of business. In the nature of its business it is to be charged with freights for the purpose, and only for the purpose, of transportation and liabilities properly incident thereto.

It has the right to prescribe reasonable and appropriate rules and regulations not in contravention of law for the conduct of its business, having in view the safety, protection and preservation of freights carried by it, and, as well, the protection of itself against fraud, injury and undue risk and liability. It may require that shippers shall deliver their articles to be transported within a reasonable time next before in the order of business the same shall be put on the vehicle or other means of transportation—usually railroad cars—and sent on their way to their destination. The shipper has no right to compel the defendant to accept freights an unnecessary and unreasonably long time before the time of starting the same on the way. Thus, if the train of cars on the railroad should start at 12 o'clock M., the shipper could not compel the defendant to receive ordinary express freight the evening next before that time, and thus compel it to assume the risk of keeping it during the night and morning following. This is so, because the nature of the business does not require that the defendant shall have the freights during that time, and such risk does not come within the nature and purpose of the defendant as a common carrier. It has the right, by appropriate and reasonable regulations, to require that the articles to be shipped shall be delivered to it within the time necessary to enable it to ship the same by the express on its next ensuing trip. Reasonable time to prepare the freight for such shipment must be allowed—not more can be required—for the mere convenience or advantage of the shipper, or to enable him to avoid a risk and put the same on the defendant, that justly ought to rest upon himself.

If the law were otherwise, the shipper of money or other things of great value, and hazardous in their keeping, might subject the defendant to a risk for hours—in some cases, for a day and night, or longer perhaps, not necessary or properly incident to its business and duties, and which the shipper himself ought to bear. Thus, one intending to send by the next express one hundred thousand dollars in gold coin, might, the evening next before the day it would start at 12 o'clock M., on purpose to avoid risk himself, compel the defendant to assume the risk of keeping the money during the meantime, not because such keeping was incident or at all necessary to its business or duties, but to disburden the shipper. It would be alike unnecessary, unreasonable and unjust to thus burden the defendant. We cannot conceive of a reason of justice, of necessity or policy that makes it necessary or proper to do so.

The defendant was bound to receive the money tendered to its agent for transportation by the plaintiff within a reasonable time next before the departure of the next express going in the direction of the destination of the money; that is, within such time as the defendant's agent could, in the order of business, receive the money and prepare it for shipment. What such reasonable time is, cannot be determined by any uniform or precise rule. This must depend upon a variety of facts and circumstances, the place, the volume of business done there, the articles to be shipped, and like considerations. The time must be sufficient to receive and ship the goods by the next express, as above indicated. *McRae* v. *Railroad*, 88 N. C., 526; *Burton* v. *Railroad*, 88 *Id.*, 536: 1 Red. on Railways, § 26, *et seq;* 2 Par. on Contracts, 174, 5 Ed.; *Lane* v. *Cotton*, 1 Ld. Ray., 352.

The plaintiff tendered the money early in the evening next before the day the next express was to go at 12 o'clock and 45 minutes of that day, and he insists that he had the right then to present and have it received, and as the agent

refused to receive it then, the defendant at once became liable for the penalty prescribed and given by the statute, (*The Code*, § 1964) and sued for in this action. The question whether this contention is well founded, or not, must be determined by a proper interpretation of the statute just cited. It prescribes that, "agents or other officers of railroads and other transportation companies whose duties it is to receive freights shall receive all articles of the nature and kind received by such company for transportation *whenever tendered* at a regular depot, station, wharf or boat-landing, and shall forward the same by the route selected by the person tendering the freight under existing laws and the transportation company, represented by any person refusing to receive such freight, shall be liable to a penalty of fifty dollars, and each article refused shall constitute a separate offence." It is conceded that the material words, "whenever tendered" used are not to be taken literally. To so treat them, would lead to practical and ridiculous absurdity. As employed, they do not imply at any and all times, as when the agent is taking his meals, while he may be reposing at night—at midnight, or daybreak, or at sunrise, or on Sunday. These words must receive a reasonable and just interpretation in the light of the business to which the statute applies, and which it is intended, in some measure, to regulate. Thus interpreted, I think they fairly imply, whenever the freight shall be tendered to the agent or officer of the company in the regular, orderly course of business, when the articles to be shipped ought to be received for that purpose—that is, within the time it is the duty of the carrier, having in view its nature and purpose, to receive the freights tendered. These words do not imply that the carrier shall receive the freights so tendered and keep them in a warehouse for an indefinite and unnecessary length of time, before, in the order of business, they can be shipped on the way to their destination. It is not the business of such com-

panies, as common carriers, to thus store and keep freights—it is their business and purpose to transport them promptly, and the purpose of the statute is to compel them to do this by imposing penalties in case they fail to do so. It was not the purpose of the Legislature to enlarge the scope of the duties and purposes of such companies—there is nothing in the statute that so provides, in terms or by just implication—the simple purpose was to compel them to a prompt and faithful discharge of their common-law duties. This Court has so repeatedly decided. *Branch* v. *The Railroad Company,* 77 N. C., 347; *Whitehead* v. *The Railroad Company,* 87 N. C., 255. In this view, the words, "whenever tendered," must mean whenever tendered as I have pointed out above. This seems to me to be the only reasonable meaning of the words as employed. Any other interpretation of them, would leave their meaning so loose and indefinite as to render their application impracticable.

Other words of the statute, as well as its spirit, strengthen the view I have thus expressed. The statute applies to companies "whose duties"—not simply in the sense of business—are to receive freights, to receive them in the order of business when they must be received to be promptly shipped on the way. Such freights must be "tendered at a *regular* depot, station," &c., the shipper "tendering the freight under *existing laws,*" not simply under statutory regulations, but as well under general principles of law applicable, such as that which requires that freights shall be received only within a reasonable time next before they are to be sent on the way to their destination. The interpretation given these words harmonizes, too, with the other statutory provision (*The Code,* § 1963), prescribing rules of transportation for railroad companies, wherein it is provided that such companies " shall furnish sufficient accommodation for the transportation of all such passengers and property as shall, *within a reasonable time previous thereto,* be offered at the

place of starting," &c. This provision is simply in affirmance of a general principle applicable, and it indicates the spirit and purpose of sundry statutory regulations that apply to railroad companies, and other companies that are common carriers, including that under consideration.

It is said that this interpretation of the statute would not accommodate the convenience of persons who might·occasionly go a considerable distance to ship money or other like things. This objection is without force. It was not the duty of common carriers to provide for such exceptional cases, and, as we have seen, the statute does not enlarge the scope of this duty; its purpose is to compel a due discharge of the same. All shippers are placed on the same and equal footing, and it is their duty to observe and learn the orderly course of business—it is their own neglect, if they will not. In the absence of any particular regulation as to the time freights should be tendered, the law provides that it shall be done within such reasonable time as will enable the carrier to ship the goods on the way by the next express after the tender.

The precise rule and practice of the defendant to be observed in receiving freights for shipment does not appear, but it does appear affirmatively that the plaintiff did not tender the money to be shipped, to the agent, within a reasonable time next before the departure of the next express going in the direction of the destination of the money. It was tendered fifteen or twenty hours, or more, before the next departure, a night intervening. The agent expressly notified the plaintiff of the rule, and that he would receive the money if tendered the next morning. The defendant had the right to decline to receive it until the next day in the forenoon—it was not bound to receive and keep it for the plaintiff during the night; if it had been received the next morning, ample time—several hours—would have been afforded to prepare it in all respects for shipment by·the next express.