## PLATT v. LECOCQ et al.

(Circuit Court of Appeals, Eighth Circuit. December 9, 1907.)

No. 2,588.

1. COURTS—FEDERAL COURT—JURISDICTION—SOUTH DAKOTA STATUTE TO REGULATE COMMERCE—FEDERAL COURTS SAME POWER AS STATE COURT UNDER.

Where, in a suit in equity in the United States Circuit Court to prevent the enforcement of an order of the Railroad Commissioners of South Dakota, in which there was diversity of citizenship, the defendants answered and filed a cross-bill to enforce the order, the United States Circuit Court, on the hearing, and this court, on the appeal, has the same power to hear and determine the original question and "to do justice in the premises" conferred upon the circuit court of the state by the act to regulate commerce. Section 449 of the Revised Political Code of South Dakota.

2. SAME—COURTS—JURISDICTION—STATE LEGISLATION MAY ENLARGE.

Rights created and remedies provided by the statutes of a state to be pursued in the state courts may be enforced and administered in the national courts either at law or in equity or in admiralty, as the nature of the rights and remedies may require.

"A party by going into a national court does not lose any right or appropriate remedy of which he might have availed himself in the state courts of the same locality." Davis v. Gray, 16 Wall. (U. S.) 203, 223, 21 L. Ed. 447.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

3. CARRIERS—REGULATION OF COMMERCE—THE GENERAL RULE OF AN EXPRESS COMPANY TO REFUSE TO RECEIVE MONEYS TO KEEP OVERNIGHT NOT VIOLATIVE OF SECTION 437, REVISED POLITICAL CODE OF SOUTH DAKOTA.

Section 437 of the Revised Political Code of South Dakota is an anti-discrimination statute. Its legal effect is to prohibit any common carrier from giving any unreasonable preference or advantage to, and from imposing, any unreasonable prejudice or disadvantage upon, any particular person, company, firm, corporation, locality, or any particular description of traffic over any person, company, firm, corporation, locality, or any particular description of traffic similarly situated.

Rules and the practice thereunder by an express company to refuse to receive packages of specie and currency on the day preceding that upon which the only trains carrying express matter start from the places of tender for the destinations of the packages between 6:29 and 8:00 a. m. do not violate this section, where the rules and practice are universal, apply to all cities and towns except such large cities as New York, Philadelphia, and Chicago, and apply to 40 cities and towns in South Dakota.

4. SAME—COMMON CARRIER HAS RIGHT TO CONDUCT ITS BUSINESS—ITS RULES AND PRACTICE PRESUMED TO BE REASONABLE.

A common carrier has the right to conduct its own business according to law free from the interference of strangers.

It may make rules for its conduct which fix the times, the places, the methods, and the forms in which it will receive the commodities it offers to transport, and these rules are presumptively reasonable and just. They may not be lawfully annulled or modified by commissions or courts unless they are clearly shown to be unlawful or unreasonable.

5. SAME—REASONABLENESS OF TIME OF RECEIPT OF GOODS MEASURED PRIMARILY BY ITS RELATION TO THE BUSINESS OF THE COMMON CARRIER RATHER THAN TO OTHER BUSINESS.

A common carrier must receive at reasonable times goods of the kinds it undertakes to transport.

But the law imposes no duty upon it to receive money or goods, and thereby to assume liability for their safe-keeping and insurance an unreasonable length of time before the transportation can begin.

The reasonableness of the time within which it must receive them is to be measured primarily by its relation to the transportation of the property, to the business of the carrier, with secondary and proper consideration of the business of its customers.

6. SAME—EXPRESS COMPANY—REASONABLENESS OF REFUSAL TO RECEIVE MONEY ON DAY PRECEDING TRANSPORTATION.

The rules and practice of an express company to refuse to receive packages of specie and currency for transportation from a bank which had a burglar proof vault and adequate facilities in the city where the packages were tendered to keep them safely overnight on the day preceding the departure of the only trains which carried express matter to the destinations of the packages, and which left at various times between 6:29 and 8:00 in the morning, are not unreasonable, unlawful, or unjust.

7. SAME—ESTABLISHED RULES AND PRACTICE—COURTS SHOULD NOT INTERFERE WITH IN ABSENCE OF INJUSTICE OR SUBSTANTIAL INJURY OR THE THREAT OF IT.

Courts and commissions should not interfere to annul or modify the established rules and practice of transportation companies on account of trivial troubles and incidental inconveniences, nor unless clear injustice or substantial injury or the imminent threat of it has resulted from them.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of South Dakota.

For opinion below, see 150 Fed. 391.

This is an appeal from a decree of the court below that an order of the Board of Railroad Commissioners of South Dakota, that the United States Express Company, an association of New York, receive at its offices in Aberdeen, S. D., from the Aberdeen National Bank, all moneys, specie, and currency tendered to it by that bank for carriage on certain trains which leave Aberdeen at 6:30, 7:00, and 7:45 a. m., during all reasonable business hours of the day preceding the departure of these trains, be enforced. The United States Express Company conducted all the express business upon these trains which were upon the lines of the Chicago, Milwaukee & St. Paul Railway, and it maintained offices at Aberdeen and at other stations on the line of this railroad to which no trains carrying express matter ran out of Aberdeen except those which started between 6:29 and 8:46 in the morning. The bank had correspondents in these towns to which it sent specie and currency on their orders in the regular course of its banking business. The business of the express company was extensive, indeed national in its character, and it was, and for many years had been, conducted in obedience to these general rules:

### "Office Safes.

"(A) Two classes of safes are provided by the company, burglar proof safes for large and important offices and fireproof safes for smaller offices.

"(B) At offices where burglar proof safes are provided, it is required that an employé shall remain in the office at night in charge of the safe.

### "Care of Money.

"(B) Money or valuables must not be accepted for shipment after trains are gone, necessitating keeping them in the office overnight. If circumstances seem to require its receipt, authority must be obtained from the general superintendent.

### "Restrictions on Receipt.

"(B) Money and valuables must not be left overnight in burglar proof safes, unless in charge of an employé on guard during the night."

These rules were universal in their application, and were enforced throughout the country, but prior to September, 1903, the agent of the company at Aberdeen, without the knowledge of the general superintendent, had broken them by receiving money the day before it could be sent to its destination and storing it overnight. Ever after September, 1903, these rules have been strictly enforced at Aberdeen, as elsewhere. The express company had no burglar proof safes or suitable safeguards for storing or keeping specie or currency at Aberdeen, which is a town of about 6,000 inhabitants, or at any of its offices, except in half a dozen large cities such as New York, Philadelphia, and Chicago. But it maintained in the cars in which it kept money in transit specially constructed stationary car safes to secure it from burglars, fire and loss. The bank, on the other hand, was in the general banking business, and as a necessary part of this business was engaged in storing and safely keeping large quantities of specie and currency at Aberdeen for itself and for its depositors, and it had a burglar proof vault with a time lock for the purpose of safely keeping this money. In the opinion of the officers of the express company the storing overnight of the packages of specie and currency, which the bank desired to send out to the towns reached by these morning trains, would necessarily entail upon it the additional expense of purchasing a burglar proof safe which would cost from $800 to $1,250, and the maintenance of a night watchman. In the opinion of the officers of the banks at Aberdeen the express company would not be required to maintain a watchman, but a burglar proof safe would be a reasonable and necessary provision for the protection of this money. The bank could store and keep the specie and currency overnight and deliver it to the express company in the morning before the trains left, without any additional expense. The disadvantages such a course would entail upon the bank were that it would be compelled to set its

time lock to open the vault at 6 in the morning, and send two of its messengers to take the money from the vault to the office of the express company in the morning before the trains left, and to take the risk of this course of proceeding, or of keeping the packages outside its vault during the night. The officers of the bank testified, however, that the police protection at Aberdeen was so complete that they did not need or use night watchmen.

The charge of the express company for the transportation of money was 40 cents for each $1,000. If it should receive and carry all the money sent out of Aberdeen to the towns under consideration, its total revenue from this transportation for one year would not exceed $600, and if the expense of this carriage did not exceed the average cost of transporting express matter, and the evidence is that it would exceed that average, its total net profit from that business would not exceed $40. If it is required to receive specie and currency tendered for transportation to these towns on the day before the trains which carry it start, the necessary expense of receiving and storing this money will exceed the profit from this business, and cause it to entail a loss upon the express company. It may not raise its rate and thus protect itself against this loss, for it would get none of this business at a higher rate because currency may be, and is, sent by mail insured for from 20 per cent. to 25 per cent. less than the express company's present rate. The business respecting which this litigation arose is the carriage of outgoing packages of specie and currency from the Aberdeen Bank to its correspondents in the country towns. Those correspondents determine the method by which this money shall be sent to them, and they pay for the carriage. The complaint of the Aberdeen Bank is not that the rules of the express company entail any expense upon it in the matter of this carriage, but that its correspondents threaten to keep larger balances in Minneapolis and smaller balances with it, unless it gets its messengers out in the morning and delivers the specie and currency which they order from it to the express company before the morning trains start, or compels the express company to receive this money on the day before these trains commence their journeys. From 80 per cent. to 85 per cent. of the business of transporting money in the country is conducted by mail. The method by which the carrying of specie and currency into Aberdeen to the bank is conducted is determined and paid for by the bank. The express company has always received all in-shipments of specie and currency coming to Aberdeen after the close of banking hours, and has stored them until the business hours of the next day, when it delivered them. Notwithstanding this fact, the bank caused shipments of money into Aberdeen to itself from St. Paul and Minneapolis, which amounted to several hundred thousand dollars, to be made by mail insured, and caused none to be sent to it by the express company during the year preceding the commencement of this suit, and thereby saved itself from 20 per cent. to 25 per cent. of the express company's rate. The expense of sending specie in large quantities by mail is too great on account of the postage, and the express company received and kept overnight specie tendered to it for transportation in amounts not exceeding $200 to a single destination. There were other express companies which had offices at Aberdeen which received silver and currency the day before the next trains to the destinations of these packages departed, but they operated upon other railroads. The United States Express Company refused, in accordance with its general rules, upon the demand of the bank, to receive and keep overnight specie in large amounts and currency for transportation on the earlier trains specified to the destination of this money in the country towns on the Chicago, Milwaukee & St. Paul Railroad. There were 40 other towns in South Dakota beside Aberdeen in which this express company maintained offices, and in which, if it received all money tendered during business hours for transportation on the trains next departing, it would be compelled to store and keep this money overnight.

Upon the state of facts which has been recited the court below adjudged that the express company should receive on the preceding day, and keep overnight, specie and currency tendered by the bank for transportation to its correspondents upon these morning trains, and this decree is assailed on the ground that the rules and practice of the express company were neither discriminatory nor unreasonable, and that the requirement of the decree is unreasonable, confiscatory, and unconstitutional.

J. W. Boyce (R. H. Warren, Frank H. Platt, and George W. Field, on the brief), for appellant.

P. J. Rogde and A. W. Campbell (E. W. Taylor and S. W. Clark, on the brief), for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The act to regulate commerce of the state of South Dakota, which is embodied in chapter 7 of its Revised Political Code, provides that the Board of Railroad Commissioners may investigate, and on notice to the carrier may hear and decide, on the complaint of a petitioner, the issue whether or not "anything has been done or omitted to be done in violation of this article, or of any law cognizable by said Commissioners" by such carrier, and that if they find such violation they may notify the carrier to desist therefrom. If the carrier does not comply with this notice or order, any person interested may apply to the proper circuit court of the state, "and said court shall proceed to hear and determine the matter speedily as a court of equity, and without the formal pleadings and proceedings applicable to ordinary suits in equity, but in such manner as to do justice in the premises." Rev. Codes S. D., c. 7, §§ 431, 446, 447, 448, and 449, pp. 78, 83, 84, and 85. The bank and the Board of Commissioners of South Dakota proceeded in accordance with these statutes until the board had investigated and heard the matter here in controversy, upon the petition of the bank, and had made the order that the express company should receive the money and store it overnight for carriage on the morning trains. Thereupon the express company exhibited its bill in the court below to enjoin the board and the bank from enforcing this order, and defendants answered and filed a cross-bill, wherein they prayed the court below to enforce the order of the Commissioners, and it was upon these pleadings, after evidence and a final hearing upon the merits, that the court below entered its decree against the express company.

Rights created and remedies provided by the statutes of a state to be pursued in the state courts may be enforced and administered in the national courts, either at law or in equity, as the nature of the rights and remedies may require. "A party by going into a national court does not lose any right or appropriate remedy of which he might have availed himself in the state courts of the same locality." Davis v. Gray, 16 Wall. 203, 221, 21 L. Ed. 447; Darragh v. H. Wetter Mfg. Co., 23 C. C. A. 609, 617, 78 Fed. 7, 14; National Surety Co. v. State Bank, 56 C. C. A. 657, 667, 120 Fed. 593, 603, 61 L. R. A. 394; Barber Asphalt Co. v. Morris, 66 C. C. A. 55, 59, 132 Fed. 945, 949, 67 L. R. A. 761. The court below, therefore, in the hearing of this case and this court upon this appeal stand in the place of the circuit court of the state, and have plenary power under the statute of South Dakota to determine the

original question of the reasonableness of the rules and practice of the express company, and "to do justice in the premises." The questions in this court arise on an appeal from a decree in equity where we must consider them de novo, invested with all the judicial and discretionary powers, and charged with all the duties of the chancellor in the court below. The questions at issue are, were the rules and practice of the express company in violation of any of the provisions of chapter 7 of the Revised Political Code of South Dakota, or of any law cognizable by the Railroad Commissioners of. that state, and if they were, was the order of the Commissioners unauthorized, or in violation of any of the provisions of the Constitution of the United States, or of the state, several of which are invoked by the counsel for the express company?

The only provisions of law that counsel for the bank contend were violated by the express company are section 437, c. 7, of the Revised Political Code, and section 1578 of the Revised Civil Code of South Dakota, which, so far as they are relevant here read in this way:

"Sec. 437. It shall be unlawful for any common carrier subject to the provisions of this article to make or give any preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic to any prejudice or disadvantage in any respect whatsoever." Rev. Codes, p. 80.

"Sec. 1578. A common carrier must, if able to do so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry." Rev. Codes, p. 786.

The legal effect of section 437 is to prohibit any common carrier from giving any unreasonable preference or advantage to, and from imposing any unreasonable prejudice or disadvantage upon, any particular person, company, firm, corporation, locality, or any particular description of traffic over any other person, company, firm, corporation, or locality, or any particular description of traffic similarly situated. Interstate Commerce Commission v. B. & O. Railroad, 145 U. S. 263, 278, 282–284, 12 Sup. Ct. 844, 36 L. Ed. 699; Interstate Commerce Commission v. B. & O. Railroad (C. C.) 43 Fed. 37, 47; Harp v. Choctaw, O. & G. R. Co., 61 C. C. A. 405, 412, 125 Fed. 445, 452; Oxlade v. Northeastern Ry., 15 Common Bench (N. S.) 680; U. S. v. Delaware, L. & W. R. Co. (C. C.) 40 Fed. 101, 103; Harp v. Choctaw, O. & G. R. Co. (C. C.) 118 Fed. 169, 176. The section is an anti-discrimination statute pure and simple. It is in pari materia with the first paragraph of section 3 of the Interstate Commerce Law of February 4, 1887, 24 Stat. 380, c. 104 [U. S. Comp. St. 1901, p. 3155], and must be interpreted in the same way. The burden was, therefore, upon the bank to prove that the rules and practice of the express company wrought a preference or advantage, or a prejudice or disadvantage to some party, locality, or description of traffic over another similarly situated. The record of this case has been searched in vain for any substantial evidence that any person, company, firm, corporation, locality, or description of traffic similarly situated to the bank and

the city of Aberdeen, or to the business of carrying money by express, was given any preference or advantage by these rules and this practice, nor does the record contain any such evidence that either the bank, the city of Aberdeen, or the particular description of traffic here under consideration was subjected by these rules and this practice of the express company to any prejudice or disadvantage over any other party, locality, or description of traffic similarly situated. The bank and the city of Aberdeen were furnished the same opportunities and facilities for shipping their money by express on the morning trains that 41 other places and their inhabitants similarly situated in the state of South Dakota were provided with. The rules and practice of the express company were universal. They governed its business of receiving and carrying money out of 41 other places in South Dakota where there were departing morning trains, and where it will be necessary for the express company to store money overnight if it receives it during the business hours of the day preceding the departure of the trains upon which it must be carried.

On the other hand, there was evidence strongly tending to show that the order of the Commissioners would inevitably subject the transportation of money by express from the bank at Aberdeen to the towns specified in the bill to a disadvantage or prejudice to which the carriage of money by express from other parties and places similarly situated is not subject, and that it will impose upon this form of traffic another disadvantage, in that the express company will be compelled to carry it on at a loss, while the other forms of traffic similarly situated which it conducts may be carried at a profit. Since the rules and practice of the express company wrought no preference, prejudice, or disadvantage to any party or locality, or description of traffic over any party, locality, or description of traffic similarly situated, they did not violate section 437 of the Revised Political Code of South Dakota. Cincinnati Chamber of Commerce v. B. & O. S. W. R. Co., 10 Interst. Com. R. 378, 382, 383.

But the express company was a common carrier, and section 1578 required it to receive these packages of specie and currency at a reasonable time and place. Was it unreasonable for the company to refuse to receive on the day preceding the departure of the morning trains and to store overnight the specie and currency which the bank might tender it for transportation to its correspondents upon these trains? The Board of Railroad Commissioners and the court below have answered this query in the affirmative, and counsel of the bank cite in support of their conclusion section 449 of the Revised Political Code of South Dakota, which declares that in any hearing in the circuit court of the state the report of the Commissioners shall be prima facie evidence of the matter therein; Alsop v. Southern Express Company, 104 N. C. 278, 10 S. E. 297, 6 L. R. A. 271, in which the majority of the Supreme Court of North Carolina, Chief Justice Merrimon dissenting, held that an express company which at 2 in the afternoon, after the only daily train to the destination of the package had departed on its regular time at 12:55 in the afternoon, refused to

receive a package of money containing $70 until the next morning, violated a statute of that state which required it to receive such packages "whenever tendered"; Atlantic Coast Line R. Co. v. North Carolina Corporation Commission, 206 U. S. 1, 27 Sup. Ct. 585, 595, 51 L. Ed. 933, wherein the Supreme Court was considering whether or not an order of the defendant in error that the railroad company should operate an extra train so as to make a connection of trains at Selma was repugnant to the due process or equal protection clause of the fourteenth amendment, and that court held that it was not, and that the mere fact that the operation of the extra train would necessarily compel the company to incur a loss upon its operation when it did not appear that this loss would cause its income to be less than its operating expenses, fixed charges, and a reasonable return upon its capital, did not of itself give rise to the conclusion that the order requiring its operation was so unreasonable as to make it violative of the Constitution, but added, "Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one"; St. L. & S. F. Ry. Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, and Minneapolis & St. L. R. R. Co. v. Minnesota, 186 U. S. 257, 267, 22 Sup. Ct. 900, 46 L. Ed. 1151, which are to the same effect—and they argue that because ordinary business hours constitute a reasonable time to conduct ordinary business, because the bank will be subject to the risk of the loss of the money if it stores it overnight, and of danger of loss of more if it opens its vault before the morning trains start, because the other express companies operating on other lines of railroad receive specie and currency at Aberdeen for transportation on the day preceding the departure of the trains which carry it, and because the United States Express Company receives incoming packages of money during the evening and night, and delivers them the next morning, the rules and practice of the express company under consideration were unreasonable, and the order of the Commission and the decree of the court should be affirmed.

But the statutory presumption that the report and the order of the commission were correct is met by a counter presumption of law, of no inconsiderable strength, that the rules and practice of the express company, which are the product of the special knowledge, wisdom, and experience of its officers and agents, who have been trained in this special business, and presumptively know better than others under what regulations it ought to operate, are reasonable and just, both to the express company and to the public. The duty and the interest of the officers and agents of the express company alike incited them to make these rules and this practice fair and just, for if they were unreasonable to the company they necessarily inflicted injury upon it, and if they were unjust to its customers they necessarily drove away the business of the express company, and proved deleterious to its interest.

A common carrier has the right to conduct its business in its own way in accordance with the rules of the common and statutory law. It

is bound to receive and to transport goods of the character which it offers to carry at reasonable times and places, but at no other times or places. It has the right to make and enforce reasonable regulations which may lawfully fix the times, the places, the methods, and the forms in which it will receive the various commodities it undertakes to carry, and the rules which it thus adopts are presumptively right and reasonable. The burden is on him who assails them to prove that they are unfair and unjust, and it is only when it clearly appears by competent evidence that they are unreasonable that commissions or courts may lawfully interfere to annul or to change them. Harp v. Choctaw, O. & G. R. Co., 61 C. C. A. 405, 410, 125 Fed. 445, 450; Lake Shore & Mich. Southern Ry. Co. v. Smith, 173 U. S. 684, 691, 19 Sup. Ct. 565, 43 L. Ed. 858; Harp v. Choctaw, O. & G. Ry. Co. (C. C.) 118 Fed. 169.

The business of a common carrier is not the storing or the safely keeping or the insuring of the safety of goods or money. Its business is the transportation of them. Nevertheless, it necessarily insures not only their carriage, but their safety from the time of its receipt of them for transportation until it delivers them at their destination. It may not lawfully refuse to receive them for carriage within a reasonable time before the transportation can commence, but, since the keeping and the insurance of the safety of the goods before and after the transportation are but the necessary incidents of the carriage, and do not constitute the chief undertaking or business of the carrier, no duty is imposed upon it to assume them an unreasonable length of time before the carriage can begin. Not only this, but the reasonableness of the time before the transportation within which it is the duty of the carrier to receive money or goods for carriage must be measured primarily by the relation of this time to the business and the liabilities of the carrier, and not by its relation to the various trades and conveniences of its customers, although, of course, not without due consideration of the latter. A carrier does not undertake to operate, nor is he responsible for, the business of its customers, or for the conduct of that business, hence the carrier's business should not be controlled primarily by the managers of the business of its customers. Lane v. Cotton, 1 Lord Raymond, 646, 652; 3 Comyns, 100, 105; 2 Parsons on Contracts (9th Ed.) *175; Story on Bailments (9th Ed.) § 508, p. 484; Hutchinson on Carriers, § 115.

The opinion of the majority of the Supreme Court of North Carolina in Alsop v. Southern Express Company, 104 N. C. 278, 10 S. E. 297, 6 L. R. A. 271, is not controlling in this case, and it is authoritative only so far as it is persuasive, and in the light of reason and principle it is not persuasive. When the only train on which an express company can carry a package of money to its destination leaves at 12:55 in the afternoon so that there are at least three business hours of that day before its departure, we are not persuaded that it is the duty of the carrier to receive the money at two in the afternoon of the preceding day and thereby to assume the liability of a warehouseman and an insurance company during the night. Its business is transporting, not storing and insuring, and no duty rests upon it to assume the

responsibilities of the latter occupations farther than it is necessary to do so to conduct its business of transportation in a rational way, and in such a case the reasonable conduct of that business does not seem to us to require an express company to assume these responsibilities before the business hours of the day of the departure of the train. The dissenting opinion of the Chief Justice is more persuasive than the opinion of the majority of the court.

The opinions of the Supreme Court in Atlantic Coast Line R. R. Co. v. North Carolina Corporation Commission, 207 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, St. L., etc., R. Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, and Minneapolis & St. L. R. R. Co. v. Minnesota, 186 U. S. 257, 267, 22 Sup. Ct. 900, 46 L. Ed. 1151, do not govern this case, because the Supreme Court was not considering and deciding in those cases, as this court must in the suit at bar, the original question whether or not the rules or practice of the quasi public corporations were reasonable, or what ought to be adjudged to do justice in the matter, but whether or not certain acts of Legislatures and Railroad Commissions were so unjust and confiscatory that they violated the Constitution of the United States. Questions of that nature cannot arise in this case because, as we have seen, this court is vested with plenary power in equity "to do justice in the premises" conferred by the Legislature of South Dakota upon the courts of that state of co-ordinate jurisdiction. The suit in hand is more analogous to Interstate Commerce Commission v. Delaware, L. & W. R. Co. (C. C.) 64 Fed. 723. The issue here is the original question of the reasonableness of the rules and practice of the express company, and upon that issue the relative cost of, and the revenue from, handling the packages of money, which the bank seeks to compel the express company to store overnight in accordance with the order of the Commissioners, are competent and important, if not controlling, considerations. Atlantic Coast Line R. Co. v. North Carolina Corp. Com., 207 U. S. 1, 27 Sup. Ct. 595, 51 L. Ed. 933; Interstate Commerce Commission v. Delaware, L. & W. R. Co. (C. C.) 64 Fed. 724; Chicago, St. P., M. & O. Ry. Co. v. Becker (C. C.) 35 Fed. 883, 886.

It does not follow from the fact that ordinary business hours constitute a reasonable time to conduct ordinary business that such hours are a reasonable time to conduct all business, or that all business hours constitute a reasonable time for an express company to receive all packages of money for transportation. The reasonableness of the time for their receipt is not to be determined by its relation to ordinary business hours alone, but by its relation to the business of the transportation of such packages, by the fact that this business is not and cannot be transacted in ordinary business hours, by the risks and liabilities entailed by receiving and storing such valuable and easily stolen packages, by the relative facilities and safeguards of the carrier and its customers for safely keeping money before the transportation commences, and by all the pertinent facts and circumstances of the case. The reasonableness of the time when an express company ought to receive and deliver packages of money is no criterion for the reasonableness of

the time when a bank ought to conduct its ordinary business of receiving deposits, discounting commercial paper, and loaning money, nor is the reasonableness of banking hours any criterion for the reasonableness of the time of receiving or delivering packages of money and transacting the business of the express company. Marshall v. American Express Company, 7 Wis. 1, 75 Am. Dec. 381.

The fact that other express companies operating on other lines of railroad receive money at Aberdeen the day before they send it out is persuasive, but not conclusive, evidence that such a practice is reasonable. But the receipt by the United States Express Company of incoming packages in the evening and in the night, and their delivery in the morning, seems to be a necessity of the business, and is far from conclusive evidence that it would be reasonable to require the company to receive such packages the day before the morning trains depart and to store and insure them through the night.

Upon a review of the entire evidence, the case in hand is this: Other express companies at Aberdeen operating upon other railroads receive and keep overnight packages of specie and currency for transportation on the early morning trains of the following day, and the United States Express Company refuses to do so in accordance with rules of universal application which it has enforced for many years, and which it deems essential to the just and economical conduct of its business. It has the right to make and enforce lawful rules, and to conduct its business according to the common and statutory law without the interference of strangers to it. Its rules are presumptively fair and just, and courts and commissions should not annul or change them unless the fact that they and the practice under them are unreasonable clearly appears. The rates for the transportation of packages of currency insured by mail are from 20 per cent. to 25 per cent. less than the rates for their carriage by the express company. This express company operates between Minneapolis and Aberdeen, and its practice has been to receive and keep incoming packages of money, which arrived in the evening and night, and to deliver them the next day. The bank controlled the method by which the currency it received from Minneapolis should be shipped to it, and it caused none of it to be sent by the express company, but many hundred thousand dollars of it by mail during the year preceding the commencement of this suit. If all the outgoing packages of specie and currency from Aberdeen to the towns specified in the report and order of the Commissioners should be sent by this express company its gross revenue from their carriage would not exceed $600, and its net income from it would be less than $40 under its present rules and practice. If it is required to receive moneys tendered for transportation to these towns on the day before the morning trains start it will be obliged to incur such additional expense and risk that this business will entail a net loss, this description of traffic will be preferred, and this bank and the city of Aberdeen will be preferred to other descriptions of traffic, towns, and their inhabitants that are probably similarly situated. The safe-keeping overnight and delivery in the

morning before the trains start of the specie and currency which the bank might desire to ship by this express company upon these morning trains will entail no more expense upon the bank than their delivery the day before, while the receipt of them on the latter day and their storage overnight will cause the express company additional expense, and will make its business of handling this money a losing one. The risk of keeping these packages of money overnight is less to the bank than to the express company, because it has a burglar proof vault, and trusty messengers for the purpose of keeping large amounts of money safely, and protecting them against robbers and fire in the city of Aberdeen, while the express company has no such safeguards and facilities in that city, and, finally, the business of the bank is to receive and keep safely for its depositors in the city of Aberdeen, and to send to them and to others who buy or borrow it, the specie or currency deposited with it, and it has a suitable vault and trusty officers and servants to carry on this business and to protect this money. The business of the express company, on the other hand, is to transport money, to keep it safely, and to insure it against loss during its transportation, and for this purpose it has specially constructed stationary safes in cars and trusty messengers to travel with it, but it is no part of its business to store or to keep valuable packages of specie or currency for any length of time greater than is reasonably necessary to conduct its transportation. The trains under consideration do not leave Aberdeen at very early hours in the morning, and it is neither impossible nor impracticable for the bank to deliver its packages of money to the express company in the morning of the day before the trains start. To require the express company to receive these packages on the preceding day, and to store them and to insure their safe-keeping overnight is to transfer to the express company a part of the risk, responsibility, and business of the bank, a part of the safe-keeping of specie and currency in the city of Aberdeen, a part of its business which it has adequate safeguards to conduct, which it undertakes to carry on, and for which it presumably receives reasonable compensation, while the express company, which has no such facilities, can secure no such compensation, and does not offer or undertake to do any such business. In view of these facts, rules, and considerations, the evidence in this case falls far short of convincing proof that the rules and practice of the express company upon this subject which have been assailed here were unreasonable or unjust. Indeed, in our opinion, it would be far more unreasonable to require the express company to receive these packages of specie and currency for transportation on the morning trains the day before they start, and thereby to compel it to store and insure them overnight, than it would be to refuse so to do, and thus to leave the bank to send them insured by mail at a lower rate, or to deliver them to the express company in the morning before the trains depart.

There is another consideration which leads to the same conclusion. Courts and commissions ought not to interfere with the established rules and practice of transportation companies on ac-

count of incidental inconveniences and trivial troubles to which the conduct of all business is necessarily subject. The business of railroad companies and express companies cannot be conducted for the purpose of carrying on the business of their customers exclusively, nor without some discomforts and inconveniences to all parties engaged in any of these occupations. Unless a clear injustice is perpetrated or a substantial injury is inflicted, or there is an imminent threat of them, the annoyances and inconveniences in the transaction of the business of the transportation companies should be left for correction to the pecuniary interests and business instincts of the respective parties concerned, and their laudable anxiety to secure, retain, and increase their business. No injustice has been perpetrated in this case. No serious damage has been, or is likely to be, inflicted upon the bank by the refusal of the express company to receive money until the morning of the day when the trains depart, in view of the pregnant fact that it has elected to cause its incoming currency to be shipped to it by mail for more than a year, and to the amounts of hundreds of thousands of dollars, when it could have caused it to have been sent by this express company. No other shipper is complaining, and the practice of the express company creates no preference or prejudice to party, locality, or description of traffic, while the practice which the bank seeks to enforce will inevitably compel other parties and other descriptions of traffic to bear a part of the burden of storing and keeping overnight the moneys it seeks to send out. There is no equity in this case of the bank, and it is entitled to no relief.

The decree below must accordingly be reversed, and the case must be remanded to the Circuit Court, with instructions to render a decree that the cross-bill be dismissed upon the merits, and that the bank and the Commissioners be enjoined from enforcing the order of the latter, and it is so ordered.

VAN DEVANTER, Circuit Judge, concurs in the result.